# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 36813-2009

IN THE MATTER OF THE TERMINA-
TION OF PARENTAL RIGHTS OF:
CHILD I, CHILD II, CHILD III, CHILD IV,
CHILD V, CHILD VI, CHILDREN UNDER
THE AGE OF EIGHTEEN.

IDAHO DEPARTMENT OF HEALTH AND
WELFARE,

  Petitioner-Respondent,

v.

JANE DOE,

  Respondent-Appellant.

Coeur d'Alene, April 2010 Term

2010 Opinion No. 50

Filed: April 30, 2010

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County, Magistrate Division.  The Hon. Linda C. Trout, Senior Judge.

The judgment of the magistrate court is <u>affirmed</u>.

Alan E. Trimming, Ada County Public Defender, Ann L. Cosho, Deputy Public Defender, Boise, for appellant.

The Hon. Lawrence G. Wasden, Attorney General, Mary Jo Beig, Deputy Attorney General, for respondent.

---

EISMANN, Chief Justice.

  This is an appeal from a judgment terminating parental rights with respect to six children. The appeal contends that the judgment is not based upon substantial and competent evidence. We affirm the judgment.

## I.  FACTS AND PROCEDURAL HISTORY

Mother was born in Burundi in 1978 in a rural area near the Tanzanian border.  Because of frequent ethnic violence between the Hutus and the Tutsis, Mother's family moved to a refugee camp in Tanzania sometime in the 1980's.  All of the family except Mother and a brother died from illness while at the refugee camp.  Mother left the camp to live with her grandmother for about one year, and then moved to the Mtendeli refugee camp in Tanzania.  During that time, she attended a few years of school, but is illiterate in her native language.

In 1997, Mother began living with a man at the refugee camp.  In order to survive, they bought and sold fruit and vegetables at the camp.  Mother and the man had a son in 1997, a daughter in 2001, and another son in 2002.  After their third child was born, the man began drinking more and beating Mother.  He was arrested for beating Mother seriously enough to require medical care, and she moved to another refugee camp for a while, but then returned.  They had another son born in 2003.  After his birth, the man stabbed Mother, requiring that she be hospitalized.  She and the children then moved to the Mkugwa refugee camp.

At Mkugwa, Mother met another man, with whom she lived for about a year.  They had a daughter born in 2004.  The relationship ended, however, when the child's father was granted refugee status and moved to Australia.  While living at Mkugwa, Mother raised enough crops to feed her family and to sell at a local market.  She also learned to make a local beer that she also sold at the market.  By selling the crops and beer, she was able to support herself and her family and to save some money.

In 2006, the immigration process began so that Mother and her children could move either back to Burundi or to a foreign country.  Mother chose the United States.  The immigration process took about six months, with Mother and her children transferring every few months to another refugee camp.  They arrived in Boise in August, 2006.

When she arrived with her five children, Mother was pregnant by a man with whom she had had a relationship just before leaving Mkugwa.  Their son was born on March 23, 2007, in Boise.

Mother and her children were brought to Boise by the World Relief Organization (WRO).  It places refugees in various communities, provides three to six months of financial assistance, and helps the refugees find lodging, jobs, access to social services, and contacts with people in the community willing to help.  WRO did the paperwork necessary for Mother to begin receiving

2

welfare (Medicaid, SSI benefits, food stamps, WIC benefits, and Section 8 housing). It also provided an apartment, some furnishings, and clothing for the family. Because Mother was illiterate and did not understand math or numbers, the WRO volunteer also was the payee on Mother's welfare benefits in order to pay the bills. The volunteer assisted Mother in buying food with the family's food stamps and in transporting her to her English classes and other appointments.

By May of 2007, WRO's assistance was coming to an end, and it was obvious to the volunteer that Mother was not able to successfully care for herself and her family. The volunteer therefore asked for help from members of her church. The church members spent a substantial amount of time, effort, and money in supporting Mother and her children. They provided Mother with daily assistance by transporting her and the children to medical appointments and church, assisting her in grocery shopping, helping her clean the apartment, washing clothes and bedding, making sure the children got to and from school, helping with school work or English lessons, paying bills, handling her mail, and buying sheets, towels and other necessities.

On August 19, 2007, several of the church members met with Mother and an interpreter to discuss what could be done for the children. They agreed that the older children could live with church members during the school year to better learn English and to better participate in school activities. About a week later, Mother signed powers of attorney permitting church members to take custody of all of the children. Church members took all of the children, but the following day the youngest child was returned to Mother at her request. In September, the church members arranged to have Mother move to an apartment in Meridian, where she would be closer to where the five older children were staying.

On October 1 and 2, 2007, Mother was taken to a hospital emergency room complaining of severe abdominal pain and headaches. There were also concerns expressed through an interpreter that Mother was having hallucinations, nightmares, and suicidal thoughts. Mother was then transferred to the behavioral health unit, where she was diagnosed as having Post Traumatic Stress Disorder (PTSD) and Major Depressive Disorder (MDD). She was placed on medications and was discharged on October 11, 2007. Two days later she was again hospitalized when she accidentally took too much medication. When Mother returned home, at her request her oldest child and her two youngest children were returned to her. By the end of October, two other children were also returned to Mother. She allowed her remaining child to stay with a

3

church family she trusted, but she had daily contact with the child. On weekday mornings, a church member would call Mother to wake the children up for school and would transport the four older children to school, and then a church member would transport the children from school back home. Eventually, they arranged for bus transportation, but still had to call Mother on weekday mornings so she would get the children ready for school on time.

On December 1, 2007, Mother was again back in the hospital complaining of feeling depressed and suicidal and having abdominal discomfort. She was again admitted into the behavioral health unit and was initially diagnosed as suffering from PTSD, MDD, psychosis, and severe social stressors. She also was not taking her medications. During this hospitalization, the children again went to stay with church members. Prior to Mother's discharge, she met with representatives from both Adult and Child Protective Services. Through an interpreter, Mother admitted that she needed assistance in raising her children. She agreed that her children could remain with church members while she dealt with her mental health issues and became better adapted to living here. They also agreed that Child Protective Services (CPS) would remain involved. When she was discharged on December 11, 2007, Mother's treating psychiatrist diagnosed her with severe PTSD and MDD. He also wrote that no psychiatric issue would prevent her from effectively caring for her children.

After she was out of the hospital, Mother demanded that her children be returned to her. One family was caring for the three older children. When they returned the children, the children did not want to stay with Mother. She agreed to permit those children to continue staying with that family. Then Mother stated that she only wanted the two younger children, and she permitted the fourth child to remain with a family from the church.

During the period from May 11, 2007, to December 18, 2007, CPS received nine referrals regarding Mother and her children. Based upon its investigation, it decided to seek removal of the children. On December 21, 2007, all six children were placed in foster care. Four of the children were already staying with church members, and the two younger children were removed from Mother's home and placed with the church family who had previously kept them. On the same day, the prosecuting attorney instituted proceedings under the Child Protective Act. On February 8, 2008, the prosecutor and Mother, through her counsel, stipulated that the children were neglected, that they come within the purview of the Child Protective Act, that Mother is

4

currently unable to meet the children's basic needs, and that the children should be placed in the custody of the Department of Health and Welfare.

The children remained in the Department's custody, and on December 12, 2008, the prosecutor filed a petition to terminate the parental rights of Mother and the children's respective fathers. The matter was tried, and on July 23, 2009, the court issued its memorandum decision. It concluded that the State had made reasonable efforts toward the reunification of Mother with her six children, but reunification was not viable due to the neglect of Mother. The court found that the State had proved by clear and convincing evidence that Mother's parental rights should be terminated because she was unable to discharge her parental responsibilities, that such inability will continue for a prolonged indeterminate period, and that it will be injurious to the children's health, morals, and well-being. The court also determined that it would be in the children's best interests to terminate their parent-child relationship with Mother and their respective fathers.

In its decision, the court considered cultural differences between the part of Africa in which Mother previously lived and where she now lives. Mother pointed out that in the African culture, children are allowed to roam freely and it is expected that all adults will watch out for them and care for them if a parent is working, sick or otherwise unable to do so. During the time the children were in the Mother's care in America, the three or four older children were frequently outside "running loose" regardless of the season or weather. They were seen at a nearby playground, the apartment parking lot, a convenience store, and a swimming hole one-half mile away, all without any supervision by Mother or any other adult. Whatever may be the circumstances in an African village, it is not appropriate here to permit children between the ages of four and ten to roam freely without adult supervision.

The termination of parental rights does not exist in Burundi. All family members and neighbors are expected to help raise the children. Consistent with that practice, Mother sought help from church members to provide homes for her children, especially during the school year. The court did not consider this conduct in a negative light with respect to the school-age children.

There was testimony that it is common in African culture for the children to mature and take on family responsibilities at an early age. The court noted, however, that there is a fine line between helping a parent with daily chores and taking on the actual responsibility of being a

5

parent. There was evidence that the older daughter, age six in 2007, was responsible not only for supervising her siblings, but taking care of Mother as well.

There was also testimony that time management was not important in the African culture. Thus, Mother could not tell time and had difficulty in understanding the need to schedule appointments, to have the children at school or to pick them up at certain times, and the importance of being on time. The trial court noted that at some point as part of fitting into the American culture, Mother should have understood the importance of time management concepts in living successfully in the United States.

The trial court considered evidence of any mental impairment Mother may have. Assessment was difficult because of the language and cultural differences, and because Mother had to communicate through an interpreter. A psychologist administered several tests to assess Mother's intellectual functioning. In his report, he noted that Mother's verbal skills "suggested intellect possibly below average with reasonably similar ratings for both judgment and insight." Based upon the testing, he gave Mother a percentage ranking which placed her as "falling in the mild to moderately impaired range of functioning, supporting the possibility of borderline intellect to mild mental retardation." In his opinion, the language problems, cultural differences, psychiatric concerns and possible cognitive limitations, "all combine to likely impair or significantly slow her capacity to learn the necessary skills required to adequately provide for the health and safety needs of her six children, as well as protect them from a socio-cultural environment quite different than that found in her country of origin." He stated that Mother had a slower than average ability to learn and adapt, and he concluded that there was a low to moderate likelihood that she will improve to a level where she can care for six children.

Based upon the evidence presented, the court found that Mother's depression and PTSD can be adequately managed through medication and would not prevent her from being an adequate parent. However, her intellectual functioning is such that she simply does not understand what she needs to do in order to parent her children and provide safety, stability and security for them now that they reside in Boise. The court found that her intellectual functioning cannot be improved with medication or education because it is simply a function of her lower intellect and is not expected to change in the future.

The court also considered the services that had been provided to Mother in an effort to enable her to parent her children and to reunite the family. They included individual counseling

for the Mother and for five of the children; psychiatric medication management; psychosocial rehabilitation services, including instruction on budgeting, food purchasing and preparation, and other basic living skills; English language classes; parenting instruction; protective parenting sessions; and supervised family visitation with role modeling. The psychosocial rehabilitation services included a six-month period during which a worker was at Mother's apartment daily and frequently several times a day. The worker's notes contained frequent notations that Mother required daily supervision to make sure she took her medications and a posted schedule and checklist to make sure she completed daily tasks. The worker characterized Mother as having "minimal comprehension of assuming responsibility for her actions." It was also the worker's opinion that if all this external support was taken away, Mother did not have the ability to meet her own basic daily needs. A social worker then took over providing these services. In her report, she stated that while the Mother was making some progress in being able to do some grocery shopping and to handle and prepare food properly, she still needed extensive help in making sure she took her medications, in arranging her own medical appointments, in attending to the children's medical or school appointments, in arranging transportation and an interpreter, in understanding dates and time, and in handling her personal finances. As of December 2008, the social worker reported that Mother continued to have difficulty speaking a complete sentence and memorizing the days of the week or the alphabet, and was unable to retain things she had learned a few days earlier.

In addition to the above-described services, Mother received SSI benefits, food stamps, and housing support. The court found that after three years in the United States and even though all of these services had been provided to her, Mother has not demonstrated an ability to handle independently all of the daily responsibilities of life for herself alone, even without any of the children present. The court concluded that Mother had not demonstrated an ability to adequately care for her six children and will not be able to do so unless there is full-time supervision and care provided for her.

The court found that since Mother arrived in Boise, she has been completely dependent upon others. She was willing to do what others tell her, but has not shown any initiative to take control of her life. She has no concrete plan for obtaining or earning money in order to support herself and her children. She does not have housing that is adequate for herself and her children. After almost three years in America, she is still barely able to communicate in English and

requires an interpreter to have any meaningful conversation with doctors, teachers, counselors and others on whom she relies for services. She is still illiterate and struggles in determining time. After all this time, Mother is exactly where she was shortly after she arrived here. The court found that Mother is unable to carry out her parental responsibilities and that there is no indication that this inability will change in the foreseeable future.

The court summarized its findings as follows:

> After fifteen months with her children in foster care, the Mother still does not understand or accept her role in causing the children to go into foster care. As a result, she has failed to grasp what she needs to do in order to parent responsibly these six children. She has not demonstrated an ability to supervise the children and is easily overwhelmed when all six children are demanding her attention and care. She cannot meet routine needs of the children like understanding their medical or psychological care needs or educational needs. She has not demonstrated an ability or plan to provide food, clothing and housing for seven people. She has not demonstrated an ability to be a parental authority figure to the children because she cannot control them and does not routinely impose consequences for misbehavior. She has not demonstrated that she understands the children's concerns for their safety in her care, nor that she can keep them safe and protected if they are in her care. Despite monumental efforts by the Department, PSR workers, the foster parents and others, she has not demonstrated that she can carry out her parental responsibilities and there is no indication that will change in the future – it certainly has not changed significantly over the last fifteen months.

The court concluded that Mother's inability to carry out her parental responsibilities will be injurious to the health, morals, and well-being of the children. It found that she was unable to address the children's health issues, could not control or supervise their activities, and could not arrange for their transportation, shelter, food, or schooling. Several of the children need special educational help and continuing counseling, which will require a parent who understands the children's special needs and can communicate effectively with service providers to meet those needs. The court found that Mother has not demonstrated an ability to do so.

The court also found that it was in the children's best interests to terminate Mother's parental rights. The children have been traumatized and need a permanent, safe, and stable environment, which cannot be provided by long-term foster care. The court determined that they need supervision; a safe home; a parent who can address their specialized health, emotional and educational needs; a parent who can provide consistent discipline and love; and a home environment where they have adequate food, shelter and clothing. Mother has not demonstrated

that she has the ability to provide all of these things for the children. The court concluded that it is in the best interests of the children to have the highest level of permanency and stability in their lives, and that will be met by terminating the Mother's parental rights and placing these children in adoptive homes.

The court entered a judgment terminating the parental rights of Mother and the children's respective fathers, and Mother timely appealed to this Court.

## II. ANALYSIS

Idaho Code § 16-2005(d) provides that a court may terminate the parent-child relationship where "it finds that termination of parental rights is in the best interests of the child and . . . [t]he parent is unable to discharge parental responsibilities and such inability will continue for a prolonged indeterminate period and will be injurious to the health, morals or well-being of the child." The trial court found that the State had proved this ground for termination by clear and convincing evidence. The only issue on appeal is whether the trial court's finding is supported by substantial, competent evidence. "Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion." *Anderson v. Harper's Inc.*, 143 Idaho 193, 195, 141 P.3d 1062, 1064 (2006). "In reviewing [the trial court's] findings, this court will indulge all reasonable inferences in support of the trial court's judgment." *In re Castro*, 102 Idaho 218, 221, 628 P.2d 1052, 1055 (1981).

In contending that there is not substantial and competent evidence supporting the court's findings, Mother points to a finding that Mother "got significantly better in paying attention during the visits to each of the children and at the February 9, 2009, visit, [the visitation supervisor] reported that the Mother was 'vigilant in making sure she knows where each of the children are and what they are doing.' " The fact that Mother improved in her ability to pay attention to the children during the weekly two-hour visits at Mother's apartment and the weekly visits with the children at the homes where they were staying does not undermine the court's findings.

Mother also argues, "There was no evidence presented that [Mother] was ever without food, utilities or in danger of being evicted." While that may be true, it was because of the extensive resources and assistance provided to Mother, not because of her ability to provide for herself or the children.

9

Mother also points to the court's finding that when the children were brought to Mother's apartment for the weekly visits, "[s]he would prepare nutritious meals for the children to eat during the visits and as the months progressed, was able to have dinner ready when the children arrived so she could devote all her time to the children." The ability to prepare meals for the children once a week does not demonstrate that the court's findings as to Mother's ability to care for them on a daily basis are erroneous.

Mother also points to the court's finding that "Mother was always excited to see the children and was loving and affectionate." There was no contention that Mother did not love her children. However, that love did not translate into the ability to discharge her parental responsibilities.

Finally, Mother contends that the court "failed to adequately address [Mother's] disabilities when considering what services should have been provided to [Mother] prior to terminating her parental rights." As stated above, the court considered the extensive services that had been provided and Mother's impaired intellectual functioning. Mother has not pointed to evidence of any supportive services which will enable her to carry out the responsibilities of parenting the children.

Mother has failed to show that the court's findings are not supported by substantial and competent evidence.

## IV. CONCLUSION

The judgment of the magistrate court is affirmed.


Justices BURDICK, J. JONES, W. JONES and J. Pro Tem KIDWELL **CONCUR**.