**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 37453**

| | | |
|---|---|---|
| IN THE INTEREST OF JANE DOE, A MINOR CHILD UNDER EIGHTEEN YEARS OF AGE. | ) ) ) | |
| ------------------------------------------------------- | ) | |
| IDAHO DEPARTMENT OF HEALTH & WELFARE, | ) ) | Pocatello, September 2010 |
| | ) | 2010 Opinion No. 127 |
| Petitioner-Respondent, | ) ) | |
| | ) | Filed: November 30, 2010 |
| v. | ) ) | Stephen W. Kenyon, Clerk |
| JOHN DOE, | ) ) | |
| Respondent-Appellant. | ) ) | |
| | ) | |

Appeal from the Magistrate Court of the Sixth Judicial District, State of Idaho, Bannock County. Hon. Bryan Kenneth Murray, Magistrate Judge.

Magistrate court decision terminating parental rights, affirmed.

Bannock County Public Defender's Office, Pocatello, for appellant. Lindsey A. Blake argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. James P. Price, Deputy Attorney General argued.

_____

BURDICK, Justice

John Doe, biological father of Jane Doe ("Jane"), appeals the magistrate court's decision that he never perfected any parental rights to Jane and that, if he did have parental rights, his rights are terminated on grounds of abandonment, neglect and Jane's best interest. John Doe argues that he did not know he was Jane's biological father until he was served with the termination papers, from which point he has acted in a manner entitling him to parental rights. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Jane is the youngest of four children born to Jane Doe II ("Mother"). She was born during Mother's marriage to John Doe II ("Father"), and Father is listed as Jane's father on her birth certificate. Father is the biological father of Jane's three siblings; however, John Doe is Jane's biological father, which was established by genetic testing during the course of the termination action.

Mother's sexual relationship with John Doe began when he was sixteen and lasted between six months to a year. During this time, Father was separated from Mother and was living outside of Idaho. Jane was conceived in approximately May 2005. When Mother was about four months pregnant, John Doe was convicted of statutory rape, stemming from a relationship he had with a high school sophomore while he was a high school senior, and was sentenced to two years determinate and six years indeterminate. John Doe knew Mother was pregnant and that the child might be his, as Mother communicated such information to him. Jane was born in 2006 while John Doe was still in prison. John Doe did not pay any costs associated with Mother's pregnancy or Jane's birth.

While in prison in March 2006, one month after Jane's birth, John Doe requested a paternity test from Child Support Services ("CSS"). CSS responded in writing on March 29, 2006, advising John Doe that Jane was the legal child of Mother and Father, that there was not a child support case relating to the child and that if he wished to challenge paternity he must pursue a private action. John Doe did not take any further action. John Doe wrote to Mother while he was in prison. A few months before he was released from prison, Mother wrote him and included pictures from when Jane was born.

On November 9, 2007, the Bannock County prosecutor filed a petition under the Child Protective Act. The petition listed Mother and Father as the parents of all four children, and alleged that an investigation indicated that the children were being neglected. On December 6, 2007, the magistrate court held an adjudicatory hearing, at which Mother and Father stipulated to the magistrate court taking jurisdiction and stipulated to placing the children under the protective supervision of the Department of Health and Welfare (the "Department").

John Doe was released from prison in April, 2008. He met Jane for the first time in May 2008 while living in Walla Walla, Washington, when Mother brought Jane to visit with him for a weekend. He and Mother agreed that he would reimburse her if she rented a car and travelled to

Washington with Jane for the visit. While John Doe and Mother disagree as to whether he ever reimbursed her, the magistrate court found that John Doe paid some money for her visit. In early 2008, the Department became aware of John Doe but did not know his whereabouts. Beginning as early as May or June, 2008, the Department mailed quarterly letters to two addresses in Walla Walla, WA, where John Doe lived at different times, but the Department received neither a response nor a notification that the letters were undeliverable.

At a hearing held on August 15, 2008, the magistrate court removed the four children from the custody of Mother and Father, and placed the children in the legal custody of the Department. Mother claims to have kept John Doe informed of the child protection case throughout its duration. John Doe denies having had knowledge of the case, and the magistrate never made a finding on this issue. The Department filed a petition for the termination of parental rights of Mother, Father and John Doe on August 26, 2009. When served with the termination, John Doe requested and obtained an attorney to represent him. In October 2009 when John Doe was attending the termination hearing, he visited Jane at the Department. This was his second and final time visiting with Jane. Jane did not recognize him but warmed up to him by the end of the visit. During the termination hearing in December of 2009, a paternity test revealed that John Doe was Jane's biological father. Mother says she would have cooperated with paternity testing earlier, but John Doe never pursued one.

Over nearly four years, John Doe knew Jane might be his child, yet he never filed with the putative father registry. He did not commence a custody or paternity action. He did not pay child support or the costs of Jane's birth. He did not send Jane gifts or provide material support. John Doe claims to have sent Mother $380 because she was being evicted, but Mother disagrees. The magistrate court concluded that some money was sent. The magistrate court found that while there were times when John Doe had no information as to where Mother and Jane were, John Doe and Mother still had off-and-on personal contact.

On February 17, 2010, the magistrate court: (1) concluded that John Doe never perfected any parental rights in Jane; and (2) ordered his rights, should he have any, to be terminated on the bases of clear and convincing evidence of neglect, abandonment and Jane's best interest. The magistrate court also terminated the parental rights of Mother and Father in Jane and her three siblings on the same grounds. John Doe filed an expedited appeal with this court on March 2, 2010.

## II. STANDARD OF REVIEW

This Court set forth the applicable standard of review in *Doe v. Roe*:

> This Court exercises free review over the trial judge's conclusions of law. The determination of the meaning of a statute and its application is a matter of law over which this court exercises free review.
>
> In an action to terminate parental rights, where a clear and convincing standard has been noted explicitly and applied by the trial court, an appellate court will not disturb the trial court's findings unless they are not supported by substantial and competent evidence. Only clearly erroneous findings are overturned, which means a reasonable person would not have relied on them in concluding as the fact finder did.

142 Idaho 202, 203, 127 P.3d 105, 106 (2005) (internal citations and quotations omitted).

## III. DISCUSSION

### A. The magistrate court correctly concluded that John Doe is not a parent.

In *Doe*, we explained that, "[o]nly after a parental interest has been identified can a court properly evaluate whether this interest may be terminated. Mere biology does not create a father with legal rights and responsibilities to a minor child." *Id.* at 205, 127 P.3d at 108. For a biological father to have parental rights, he must satisfy the definition of "parent" under I.C. § 16-2002.[1] *Id.* Idaho Code § 16-2002(11) defines "parent" as "(a) The birth mother or the adoptive mother; (b) The adoptive father; (c) The biological father of a child conceived or born during the father's marriage to the birth mother; and (d) The unmarried biological father whose consent to an adoption of the child is required pursuant to section 16-1504, Idaho Code." John Doe does not satisfy the requirements of I.C. § 16-2002(11)(a), (b), or (c), as he is not the mother, is not the adoptive father and was never married to the birth mother. The only way John Doe can be a parent under I.C. § 16-2002 is if his consent to an adoption is required pursuant to I.C. § 16-1504.

Consent to an adoption is required from a "biological parent who has been adjudicated to be the child's biological father by a court of competent jurisdiction prior to the mother's execution of consent." I.C. § 16-1504(1)(d). In *Doe*, 142 Idaho at 205, 127 P.3 at 108, this Court found that merely entering a paternity test into evidence during a termination action, which is what John Doe has done in this case, does not satisfy the requirements of I.C. § 16-1504(1)(d).

---

[1] Idaho Code § 16-2002 was amended in 2005. 2005 Idaho Session Laws, ch. 391 § 47. Although the statute now defines "parent" differently, the amendments do not affect the requirement that a biological father must meet the statutory definition of "parent" in order to have parental rights.

Consent to an adoption is also required from an "unmarried biological father who has filed a voluntary acknowledgement of paternity with the vital statistics unit of the department of health and welfare pursuant to section 7-1106, Idaho Code." I.C. § 16-1504(1)(i). John Doe never filed an acknowledgement of paternity.

Finally, consent to adoption is required from "an unmarried biological father of an adoptee only if the requirements and conditions of subsection (2)(a) or (b) of this section have been proven." I.C. § 16-1504(1)(e). Subsection (2)(a) provides, in relevant part:

> (i) . . . [A]n unmarried biological father shall have developed a substantial relationship with the child, taken some measure of responsibility for the child and the child's future, and demonstrated a full commitment to the responsibilities of parenthood by financial support of the child, of a fair and reasonable sum and in accordance with the father's ability, when not prevented from doing so by the person or authorized agency having lawful custody of the child; and either:

> 1. Visiting the child at least monthly when physically and financially able to do so, and when not prevented from doing so by the person or authorized agency having lawful custody of the child; or

> 2. Have regular communication with the child or with the person or agency having the care or custody of the child, when physically and financially unable to visit the child, and when not prevented from doing so by the person or authorized agency having lawful custody of the child.

> (ii) The subjective intent of an unmarried biological father . . . shall not preclude a determination that the father failed to meet the requirements of this subsection.

I.C. § 16-1504(2)(a).

The magistrate court had substantial and competent evidence supporting its determination that John Doe failed to meet the requirements of subsection (2)(a). John Doe has not developed a "substantial relationship" with Jane as required by subsection (2)(a). His only communication with Jane over four years occurred during their two visits. He has not "demonstrated a full commitment to the responsibilities of parenthood by financial support" as required by subsection (2)(a). John Doe claims to have provided financial support on only two occasions. John Doe has not visited Jane monthly, nor had regular communication with Jane, Mother or the Department, as required by subsection (2)(a).

Each of the requirements in subsection (2)(a) is conditioned by the phrase "when not prevented from doing so by the person or authorized agency having lawful custody of the child." John Doe asserts that Mother never told him he was the biological father and that she moved without notifying him of her location while she still had custody of Jane. John Doe also asserts

5

that the Department failed to notify him of the CPA proceedings upon learning that he might be Jane's biological father. Not infrequently, this Court is presented with arguments that the Department did not do enough when the analysis should primarily focus on what the putative parent did or did not do.

The magistrate court had substantial and competent evidence to conclude that John Doe knew the child might be his and had occasional contact with Mother, but that he failed to establish a "substantial relationship" or demonstrate "a full commitment to the responsibilities of parenthood by financial support." The magistrate court concluded: "[Doe] was having sexual relations with the mother at the time of conception. He knew the child might be his. He knew the child was born and showed enough curiosity to make arrangements for the mother and child to visit him in Washington State." The magistrate court also found that the Department sent correspondence to the address for John Doe's parents after becoming aware that John Doe might be Jane's father, that John Doe lived with his parents upon release from custody and that the Department never received a response. Despite all of this, there is no indication that John Doe tried to establish anything resembling a substantial relationship, nor that he tried to provide fair and reasonable financial support. John Doe simply failed to grasp the opportunity to make a significant connection with the child who he knew might be his, and he was not prevented from doing so by Mother or the Department.

Therefore, we affirm the part of the magistrate court's order finding that John Doe's interest in Jane never ripened into a parental right and, therefore, John Doe has no parental rights in Jane. Accordingly, we need not address the issue of whether his parental rights should have been terminated for abandonment and neglect. *See Doe,* 142 Idaho at 207, 127 P.3d at 110 ("Father's biological interest never ripened into a parental right over Baby Doe. We do not need to proceed to the next step as the magistrate judge did and determine whether Father's parental rights should be terminated under these circumstances. They simply never arose.").

**B. John Doe's due process rights were not violated.**

John Doe argues that, even if he is not a "parent" under I.C. § 16-2002, his due process rights were violated. John Doe distinguishes his case from *Doe v. Roe* on two grounds. First, in *Doe*, the biological father maintained a close relationship with the mother after the child's birth. *See Id.* at 203, 127 P.3d at 106. Whereas John Doe argues that he did not maintain a close relationship with Mother. Second, in *Doe*, the petition for termination was initiated by the

child's legal father. *Id.* at 205, 127 P.3d at 108. Whereas in John Doe's case, the Department initiated the termination proceedings. John Doe claims that, unlike the biological father in *Doe*, he had no way of knowing he was Jane's biological father and never had the opportunity to establish paternity or develop a relationship with Jane until he was served with the termination papers.

John Doe cites a California appellate court decision in support of his argument. The California court stated, "if an unwed biological father promptly comes forward and demonstrates a full commitment to his parental responsibilities, his federal constitutional right to due process prohibits the termination of his parental rights absent a showing of his unfitness as a parent." *In re Julia U.*, 74 Cal. Rptr. 2d 920, 925 (Cal. Ct. App. 1998). John Doe argues that his response after being served with the termination papers, like the response of the biological father in *In Re Julia U.,* constitutes promptly coming forward and demonstrating a full commitment to his parental responsibilities; therefore, due process prohibits terminating his parental rights. We disagree.

In *Doe*, we thoroughly analyzed this due process issue. 142 Idaho at 206–07, 127 P.3d 109–10. When an unwed father demonstrates a full commitment to the responsibilities of coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the due process clause. *Id.* at 206, 127 P.3d at 109 (*citing Caban v. Mohammed*, 441 U.S. 380, 392 (1979)). An unwed father must grasp the opportunity to make a significant connection with his child. *Id.* "The fleeting opportunity may pass ungrasped through no fault of the unwed father or perhaps due to the interference of some private third party; nevertheless, once passed the unwed father is left without an interest cognizable under the Fourteenth Amendment." *Id.* at 207, 127 P.3d at 110 (*quoting In re Steve B.D.*, 112 Idaho 22, 25, 730 P.2d 942, 945 (1986) (citing *Lehr v. Robertson*, 463 U.S. 248, 267–68 (1983)).

Despite any factual differences between this case and *Doe*, John Doe failed to grasp the opportunity to establish the parental rights available to him. John Doe knew that Mother became pregnant around the time of their relationship and later gave birth to Jane, and he maintained some contact with Mother and Jane over the following four years. Yet, John Doe never took any of the steps available for him to establish himself as Jane's parent. He never filed a voluntary acknowledgment of paternity with the Department. He never initiated legal proceedings to be

adjudicated the child's biological father. He never established a substantial relationship, demonstrated a commitment to the responsibilities of parenthood by providing financial support, nor did he visit Jane monthly or maintain regular contact with Jane, Mother or the Department. Thus, John Doe failed to assert his parental rights under Idaho law and never acquired the substantial protection afforded by the due process clause to a parent's interest in their biological child.

## IV. CONCLUSION

We affirm the magistrate court's determination that John Doe is not a "parent" under I.C. § 16-2002 and, therefore, has no parental rights to Jane. Mere biology does not create a father with parental rights, and John Doe failed to grasp the opportunity to establish himself as Jane's parent. Costs to the Department.

Chief Justice EISMANN and Justices J. JONES, W. JONES and HORTON, **CONCUR.**