## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 42291

IN THE MATTER OF THE
TERMINATION OF THE PARENTAL
RIGHTS OF JANE DOE (2014-17).

---------------------------------------------------------

IDAHO DEPARTMENT OF HEALTH &
WELFARE,

    Petitioner-Respondent,

v.

JANE DOE (2014-17),

    Respondent-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, October 2014 Term

2014 Opinion No. 133

Filed: December 15, 2014

Stephen W. Kenyon, Clerk

---

Appeal from the District Court of the Seventh Judicial District, State of Idaho, Bonneville County. Hon. Ralph L. Savage, Magistrate Judge.

Magistrate court decision terminating parental rights, <u>affirmed.</u>

Crane Law, Idaho Falls, for appellant.

Hon. Lawrence G. Wasden, Idaho Attorney General, for respondent.

---

BURDICK, Chief Justice

Jane Doe ("Mother") appeals the Bonneville County magistrate court's judgment that terminated her parental rights to three of her children. The magistrate court concluded that the Idaho Department of Health and Welfare ("IDHW") proved by clear and convincing evidence that Mother and John Doe ("Father") neglected their children and that terminating parental rights was in the children's best interests. Mother argues IDHW did not show clear and convincing evidence, the court failed to properly consider her disability, and IDHW did not make reasonable efforts to help her comply with her case plan. We affirm the magistrate court's judgment terminating Mother's parental rights.

1

# I. FACTUAL AND PROCEDURAL BACKGROUND

Mother and Father are married and have three biological children together. Their older daughter, B.M., was born in 2002. Their younger daughter, A.M., was born in 2004. Their son, S.M., was born in 2007. This case began as a child protection case in 2010, was vacated in January 2011, was reopened in 2012, and resulted in a judgment terminating parental rights in 2014. The magistrate court's termination of Mother's parental rights is the subject of this appeal.

In 2009, family members started to notice Mother and Father struggling. Father had lost his job with a law firm and had stopped attending school board meetings at his children's school, where he was chairman of the board of education. The children's grandparents grew concerned because of Mother and Father's alcoholism, the home's condition, and Mother and Father's care for the children. IDHW first opened an informal case in 2009, after IDHW received several referrals from Mother and Father's family members.

Around that same time, teachers noticed that B.M. and A.M. missed many days of school. When B.M. and A.M. were at school, they had dirty uniforms, unkempt hair, and needed breakfast because they had not eaten at home. In November 2009, several teachers and the principal from the children's school went to Mother and Father's house to offer assistance and found the home cluttered and dirty. S.M. had no diaper or clothes on. Consequently, a teacher voluntarily took S.M. for several weeks. B.M. and A.M. went to live with their paternal grandmother next door. When S.M. returned home several weeks later, the home's condition had not improved. That same month, an officer serving an arrest warrant on Mother noticed problems with the home's condition, including that the home was cluttered and smelled like urine. The officer instructed Mother and Father to make changes within 48 hours. The officer found only slight changes two days later.

On February 25, 2010, a case worker and an officer went to Mother and Father's home. The officer found S.M. in the house unsupervised. B.M. and A.M. were still living with their grandmother next door at the time. The officer found problematic conditions inside the home and cited Father for misdemeanor injury to a child. The officer declared S.M. in imminent danger and placed S.M. into shelter care. Mother was incarcerated at the time, so she was not at the house.

The Bonneville County prosecutor filed a petition under the Child Protective Act (CPA) to place all three children in shelter care. The next day, the magistrate court ordered the children removed from the home pending a shelter care hearing. The court held a shelter care hearing on

March 1, 2010, but Mother and Father did not attend. At the hearing, the court placed the children in IDHW's care pending an adjudicatory hearing. The court determined there was reasonable cause to believe the children came within the CPA due to neglect. The court also determined that IDHW made reasonable efforts to prevent the need for placement and it was in the children's best interests to give temporary legal custody to IDHW. The court later appointed a guardian ad litem (GAL).

The court held an adjudicatory hearing on April 7, 2010. During that hearing, Mother and Father stipulated to give custody to IDHW. The court found IDHW had made reasonable efforts prior to placing the children in foster care and that it was in the children's best interests to vest legal custody in IDHW. The court later approved IDHW's case plan for Mother and Father. As part of the plan, the At Risk Family Intervention Program trained Mother and Father on parenting skills and basic house cleaning skills. Mother and Father completed this training. In July 2010, after the children were in foster care for five months, the court allowed an extended home visit. In September 2010, the family moved to a rental house because their mortgage had been foreclosed. The family prepaid their rent with Mother's disability income. The children's extended home visit continued until a January 2011 review hearing, when the GAL and case manager recommended vacating the case because the parents had complied with the case plan. This was despite reports that the home's cleanliness was still an issue. Mother and Father did not attend that hearing. The court vacated the case on February 4, 2011.

In July 2011, Mother and Father were cited for misdemeanor injury to a child because a police officer observed that their house was in an unsanitary condition. At the time, the officer observed that Mother and Father had been drinking alcohol. Mother and Father had been on a drinking binge for several weeks.

In January 2012, Father was incarcerated because of a domestic violence incident that involved Mother. Both Mother and Father were intoxicated at their home during that incident, and Mother had locked herself in a bathroom and sent B.M. a text message to call police. A resulting no-contact order prohibited Father from contacting Mother. The court put Father on pre-trial release, but revoked that release because Father missed required appointments and did not complete his urinalysis.

The court then issued a warrant, and officers went to Mother and Father's house to look for Father. Mother claimed he was not in the house. The officers found Father in the house and

3

arrested both parents: Father for violating the no-contact order and Mother for obstructing an officer. The officers contacted IDHW because the only adult left at the home after Mother and Father's arrest was Mother's ex-mother-in-law, who was an alcoholic.

IDHW re-opened the case and appointed a GAL. The first adjudicatory hearing was continued because Mother and Father did not attend and did not have sufficient notice. At the next adjudicatory hearing, Mother and Father stipulated that the court had jurisdiction because of an unstable home environment, but objected to giving IDHW custody. The court allowed the children to stay at home subject to IDHW's protective custody. The court also ordered Mother and Father to sign medical releases for the children to update IDHW on the children's progress. In April 2012, S.M.'s doctor complained to IDHW that S.M. was failing to thrive because he had regressed to diapers, had not received his prescribed medications, and was not increasing in weight. Mother and Father attended that visit, but the nurse found Mother would not give straight answers about S.M.'s care.

On May 21, 2012, the court held a case plan hearing. The court ordered Mother and Father to participate in a group decision-making meeting, submit to drug tests, comply with the court's orders, and allow IDHW home access. The court told Mother and Father that it could remove the children if Mother and Father failed to comply. Mother and Father submitted to hair follicle drug testing that day and both tested positive for methamphetamine. The results indicated "high, daily, constant use" for both parents. IDHW visited the home and found it cluttered, dirty, and unsanitary. The inspection revealed many problems, including large laundry piles, items resting against a wood stove, and a cup of mold on B.M.'s bedside table. IDHW gave Mother and Father 48 hours to clean their home, and Mother and Father failed to properly clean their home within that time.

On May 24, 2012, the court placed all three children in foster care. The court did this because Mother and Father had tested positive for methamphetamine, refused to sign medical releases, had not cooperated with IDHW, and appeared ready to move to California. All three children were initially placed with their paternal grandmother, but S.M. was moved to a separate foster home a few weeks later. S.M.'s physical health immediately improved in foster care.

A redisposition hearing was held on May 29, 2012. The court decided to keep the children in IDHW's custody until a June 21, 2012 hearing. The court approved a case plan on June 25, 2012. The case plan included requirements that Mother and Father: participate in

4

substance abuse programs; sign releases allowing the case manager to assess Mother and Father's progress in treatment; submit to random drug testing; keep all mental health appointments; follow probation; participate in visitation; attend their children's medical appointments; and maintain a stable home.

The court held more review hearings and continued to find it was in the children's best interests to stay in IDHW's custody. At an August 2012 review hearing, the court found Father had not worked with the case plan and Mother had only made some recent progress on the plan. Father did not attend this hearing. Mother and Father then both failed to attend a November 2012 review hearing. Father also did not attend a January 2013 review hearing. At the hearing the court noted that Father did not comply with his case plan and that Mother had "somewhat complied," but by residing with Father had showed she was unwilling to establish a safe residence. Mother and Father attended a March 2013 review hearing, where the court again found they were not making progress on the case plan and it was in the children's best interests to remain in IDHW's care.

Mother and Father then had almost no contact with the GAL or IDHW for two months. They attended only one visit with the children between March 18 and May 13. Mother was arrested in April for petit theft after she stole from Walmart. Mother was also hospitalized for substance abuse in April. Around the same time, Mother and Father were evicted from their home and did not attend drug testing.

The court held a permanency hearing on May 13, 2013. Mother and Father failed to attend the hearing. The court ultimately approved a permanency plan to terminate parental rights and ordered IDHW to file a termination petition. The court also suspended visitation because the parents had not complied with the court orders or their case plan and had missed two months of visitation and counseling. The court then suspended reunification efforts at a May 29, 2013 hearing. Neither parent attended that hearing. IDHW filed petitions to terminate Mother and Father's parental rights and later amended those petitions. The amended petitions and summons were personally served on Mother and Father on June 1, 2013.

On July 22, 2013, the court held a termination hearing. Mother and Father failed to attend.[1] Mother's attorney attended, but told the court he had not heard from Mother since March. Because both parents failed to attend, IDHW put on their *prima facie* case. The court then found that due to neglect and an unstable home, it was in the children's best interests to terminate Mother and Father's rights. The court entered a default termination decree.

Mother and Father arrived in court two hours after the hearing was over, claiming car trouble. They filed a motion to set aside the judgment on August 5, 2013. The court granted that motion on November 1, 2013, due to excusable neglect and the interest of justice.[2] The court held a review hearing three days later, which Mother and Father did not attend. At the review hearing, the court approved the permanency goal of adoption by a relative. On December 9, 2013, the court allowed the children to be placed with Father's half-sister ("Aunt") who lives in Bozeman, Montana. Aunt is a professor at Montana State University. She and her partner ("Uncle") have one son who is close in age to B.M.

The trial was scheduled for three days in February 2014, but actually took ten days. The trial included over thirty witnesses. Father represented himself and attended every day. Mother was represented by counsel and did not attend one day because she was sick. At trial, Mother testified about her numerous health problems. She reported having a small stroke that continues to affect her memory. She testified that she suffers from bi-polar disorder, although her treating doctor testified that it was instead major depressive disorder. Mother also testified that she receives disability income due to these problems and others, including irritable bowel syndrome, post-traumatic stress syndrome, and migraines. She stated that her stroke and mental health did not affect her ability to clean the house, but did interfere with her memory.

Many witnesses testified about Mother and Father's abuse of drugs and alcohol. Mother and Father both completed substance abuse counseling in 2010. Both Mother and Father were admitted to the hospital for detoxification on May 17, 2013. Mother and Father tested positive for methamphetamine in 2012. B.M. knew about Mother and Father's methamphetamine use. Mother and Father admitted that they used methamphetamine during 2011 and 2012, but denied that they were still using. Father testified that he has an anxiety disorder that contributes to his

---

[1] On May 31, 2013, Father's attorney filed a motion to withdraw. On June 24, 2013, the court granted that motion and ordered the attorney to send Father a copy of that order. Father was to indicate how he wanted to proceed. The court received nothing from Father, so it entered a default judgment against him with a decree terminating his rights.
[2] Mother and Father appealed the trial court's July 22, 2013 decision to this Court. The appeal was dismissed because the trial court granted the motion to set aside.

alcohol abuse when his anxiety is uncontrolled. He testified that he is now on medication for anxiety and is not drinking alcohol. Mother's probation officer reported that she tested negative three times for drugs after her 2013 theft charge. Mother and Father also consistently attended counseling and treatment with A to Z counseling since January of 2014, but that counseling did not include substance abuse treatment. Mother and Father did not provide the court with any recent tests to prove their sobriety.

Many witnesses testified about the cluttered and dirty condition of the home from 2009 to 2013. These witnesses included police officers, IDHW employees, and school employees. Witnesses reported dirty clothes in heaps on the floor, rotting food, unwashed dishes, dog feces on the floor, and sharp objects within S.M.'s reach. A landlady testified that when Mother and Father moved out, the carpet was ruined, moldy food was in the kitchen, and there were dog feces and liquor bottles in the bedrooms. Father and Mother testified that they were hoarders and had collected a lot of stuff, but now had a clean home.

Other testimony focused on other troubles. Both parents had been incarcerated during the child protection case. Mother was arrested for driving without privileges, obstructing an officer, and failure to appear. Father was incarcerated for violating his work release and probation. He remained in jail for several months during 2012. Both parents were unemployed. Mother did not work because she was on disability. Father's unemployment began in 2011 and continued through the trial. The family was evicted from at least three residences since 2009. Both parents also testified that they had extended episodes of alcohol abuse. During that time, they would be unable to care for the children or maintain a clean and sanitary home. When both parents used methamphetamine, they would lock themselves in their bedroom for days at a time.

Numerous witnesses, including the IDHW case manager, foster parents, and Mother and Father's family, all testified about how Mother and Father failed to attend planned visits and were late to visits. At one point, IDHW required Mother and Father to call and confirm visits several hours before so the children would not be disappointed. Mother and Father also missed parent-teacher conferences.

The children's foster parents, IDHW employees, CASA volunteers, and family all testified about the children's health. The children remained in IDHW's custody in several foster homes since May 24, 2012. The court found that while initially the children were traumatized by foster care placement, all showed improvement in their physical health since then. Testimony

indicated S.M. did well at his foster home. B.M. and A.M.'s mental, emotional, and physical health also improved at their foster home, and they were able to visit S.M. on weekends. The children moved to another home in fall of 2013, and that placement did not go as well as the others. But things did go well when the children were placed with Aunt in December 2013. All three children wanted Aunt to adopt them and were sad about their parents' choices. All testifying extended family members confirmed that living with Aunt was in the children's best interests. No family members, other than Mother and Father, indicated that termination was not in the children's best interests.

Both parties submitted closing briefs to the court. While IDHW's petition sought to terminate Mother and Father's rights on various grounds, IDHW's closing brief primarily sought termination based on neglect. The trial court entered its Findings of Fact and Conclusions of Law on June 11, 2014. The court found, by clear and convincing evidence, that Mother and Father had neglected the children and that terminating their parental rights was in the children's best interests. Mother timely appealed.

## II. ISSUES ON APPEAL

1. Whether the trial court erred by finding clear and convincing evidence to terminate Mother's parental rights.

2. Whether the trial court considered Mother's alleged disabilities and IDHW's support services.

## III. STANDARD OF REVIEW

The IDHW must show grounds for termination of parental rights "by clear and convincing evidence because each parent has a fundamental liberty interest in maintaining a relationship with his or her child." *Idaho Dep't Health & Welfare v. Doe*, 150 Idaho 36, 41, 244 P.3d 180, 185 (2010). Clear and convincing evidence is evidence that indicates the thing to be proved is highly probable or reasonably certain. *Id.* On appeal, we "will not disturb the magistrate court's decision to terminate parental rights if there is substantial, competent evidence in the record to support the decision." *Id.* Substantial, competent evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.*

## IV. ANALYSIS

Here, the magistrate court terminated Mother and Father's parental rights because it found neglect and that it was in the children's best interests to terminate those rights. Father did

not appeal. Therefore, we will focus on Mother's relationship with her three children. *See In Interest of Cheatwood*, 108 Idaho 218, 219, 697 P.2d 1232, 1233 (Ct. App. 1985).

**A. The trial court did not err when it terminated Mother's parental rights because substantial and competent evidence supports that decision.**

Statutory grounds for termination of parental rights include: (a) abandonment; (b) neglect or abuse; (c) lack of a biological relationship between the child and a presumptive parent; (d) inability to discharge parental responsibilities for a prolonged period, which will injure the child's health, morals, or well-being; or (e) a parent's incarceration for a substantial period of time during the child's minority. I.C. § 16–2005. To terminate parental rights, the trial court must find at least one of these grounds for termination and then also find that it is in the children's best interests to terminate the parent-child relationship. I.C. § 16–2005(1).

Here, the trial court found clear and convincing evidence of neglect and that it was in the children's best interests to terminate parental rights. Mother argues the trial court erred in doing so.

1. <u>Substantial and competent evidence supports the trial court's finding of neglect.</u>

Mother argues that because of her disabilities, the trial court could not have found she willfully failed to comply with the case plan or willfully neglected her children. However, willful neglect and willful non-compliance with the case plan is not the standard. Neglect is a statutory ground for terminating parental rights under Idaho Code section 16-2005. "Neglected" is defined in Idaho Code section 16-2002(3) as

(a) Conduct as defined in section 16-1602(28), Idaho Code; or

(b) The parent(s) has failed to comply with the court's orders or the case plan in a child protective act case and:

(i) The department has had temporary or legal custody of the child for fifteen (15) of the most recent twenty-two (22) months; and

(ii) Reunification has not been accomplished by the last day of the fifteenth month in which the child has been in the temporary or legal custody of the department.

Idaho Code section 16-1602(28) defines neglected as a child

(a) Who is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them; . . . or

9

(b) Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being; or

(c) Who has been placed for care or adoption in violation of law; or

(d) Who is without proper education because of the failure to comply with section 33-202, Idaho Code.

Idaho Code section 16-2005 allows the court to terminate parental rights upon a showing of any of the enumerated conditions. *In Interest of Dayley*, 112 Idaho 522, 526, 733 P.2d 743, 747 (1987). "Whether neglect has occurred is a question of fact to be established by clear and convincing evidence." *In re Doe*, 156 Idaho 103, ___, 320 P.3d 1262, 1269 (2014).

Mother argues that IDHW did not present clear and convincing evidence that terminating Mother's parental rights was appropriate under Idaho Code section 16-2005. The trial court found clear and convincing evidence under both aspects of the "neglected" definition in Idaho Code section 16-2002(3). The court found Mother and Father displayed neglect when they: (1) were under the influence of drugs and alcohol in their bedroom while their children were unsupervised; (2) failed to attend visitation; (3) allowed S.M.'s health to grow poor in their custody; (4) did not meet the children's needs for food; and (5) failed to properly supervise and care for the children. The court elaborated that the parents failed to maintain a normal relationship with the children, may lack the ability to change their conduct to assume parental responsibilities, lacked stable housing and employment, and used alcohol or drugs. This is neglectful behavior that showed Mother and Father failed to provide their children with proper parental care and control under section 16-2002(3)(a), as set forth in 16-1602(28).

The court also found behavior that is clear and convincing evidence of neglect as defined in 16-2002(3)(b). The court found the parents completely failed to comply with the case plan during the first fifteen months of the 2012 case, IDHW had temporary custody of the children for the required time period, and reunification was not accomplished in the required time period. The court noted that both Mother and Father did not attend some visitations, did not provide releases to IDHW, did not submit to drug testing, did not remain drug free, and did not participate in counseling. These tasks were all part of their case plan. The court found that both parents had attempted to comply with the counseling portion of the case plan for several months before trial and testified they were sober at the time of the trial. However, the case plan provided that they prove sobriety through testing, which they did not do. The court found that despite any recent

10

efforts, Mother and Father failed to comply with the majority of the case plan, "especially during the most important phase of a child protection case."

Mother attacks the trial court's neglect finding with specific arguments on certain areas of the trial court's decision, but never argues that she followed the case plan or that none of her actions show neglect. We will address her individual arguments, but note that even if Mother's arguments were valid, she should have followed the case plan to avoid a finding of neglect under Idaho Code section 16-2002(3)(b). Mother must also show the court did not have substantial and competent evidence of the conduct in section 16-2002(3)(a)'s definition. She does not argue either. Even if she had, trial testimony about missed visitations, incarceration, and instability in the home could provide substantial and competent evidence to support the trial court's neglect finding.

Mother argues that her issue with alcohol did not rise to a level that warranted termination because she admitted her past issues, reached out for help, and successfully went through a child protection action in 2010. However, both parents testified that they had episodes of alcohol abuse for extended periods of time from 2009 through 2013. During that time, numerous witnesses testified that Mother and Father were unable to care for the children or maintain a clean and sanitary home. Thus, evidence in the record supports the trial court's decision that alcohol contributed to neglect.

Additionally, Mother argues there was no evidence that showed any addiction or a long-time use of methamphetamine. Therefore, she contends methamphetamine should not have been a continuing concern. The court found that Mother and Father used methamphetamine in their room and that use continued on a frequent basis through 2011 into 2012. Mother and Father testified that they used meth in 2011 and 2012, and both Mother and Father tested positive in May 2012 for levels that showed daily, constant use. However, the trial court made no finding that Mother was addicted to methamphetamine. Instead, the court found that Mother had neglected her children when she was under the influence and not supervising them. The court also found Mother had failed to comply with the case plan by not providing proof through testing that she was sober. Substantial and competent evidence supports these findings and therefore the court could properly use these findings in determining neglect.

Mother argues that her many moves to different homes do not establish clear and convincing evidence of neglect because her children moved just as many times under IDHW's

11

care. Mother explains that some of her moves won't repeat themselves because she lost some disability income when the children were removed, so she had to move to a smaller house. The trial court explained that it found the moves concerning because they were evictions for non-payment and not planned moves. The court explained that evictions are different because they are more emotional and traumatic on a family. While the children were not living with their parents for several of the evictions, the children had visitations with their parents at these residences and were aware of the evictions. The trial court considered the evictions as part of Mother and Father's larger problem of instability, which was also established through Mother and Father's time away from the children due to incarcerations and substance abuse problems. Thus, Mother's many moves are evidence that a reasonable mind might accept to support the court's neglect finding.

Mother additionally argues that no evidence showed the children suffered harm from an unsanitary home that would justify termination. However, "Idaho's termination statute exists 'not merely to alleviate harm but to prevent it.'" *In re Doe*, 156 Idaho at ___, 320 P.3d at 1269 (quoting *In the Interest of Cheatwood,* 108 Idaho at 220, 697 P.2d at 1234). Teachers from the children's school, law enforcement officers, and social workers all testified that the home was cluttered and dirty in 2009 and 2010. While the 2010 case was vacated, in July 2011 an officer cited both Mother and Father for misdemeanor injury to a child because of their home's condition. That officer found the home was a mess with garbage, dog feces, old food, and piles of clothes. Other witnesses testified that the piles of dirty clothes in the house at one point reached five-feet high, items rested against the wood stove, mold grew in a cup in B.M.'s room, and sharp objects were within S.M.'s reach. Any of these conditions could have caused the children immediate physical harm, but luckily they did not. Hence, the fact that Mother and Father's homes were dirty and cluttered from 2009 until 2013 is a factor the trial court could rely on to find neglect.

Further, Mother fails to recognize that the court did not terminate Mother's rights solely because of Mother's unsanitary home, multiple moves, methamphetamine use, or alcohol struggles. The record indicates that at several times during the case, Mother was under the influence of drugs and alcohol in her bedroom and did not supervise the children. Mother allowed S.M.'s health to grow poor enough that he was diagnosed with failure to thrive. Mother missed multiple visitations. Mother was incarcerated several times. Mother's actions did not

comply with the case plan and showed she failed to provide her children with proper parental care and control. Thus, substantial and competent evidence supports the court's finding that clear and convincing evidence established neglect.

Mother also contends that at the time of trial, the parents' home was without clutter and she was drug-free. The trial court acknowledged that Mother and Father may now have an uncluttered home. The court noted that Mother has attended counseling for several months and had not tested positive for drugs in several urine tests during her probation. The court indicated that although Mother and Father may be drug free, stable, and progressing in treatment, the court did not see any overwhelming evidence of this. Mother and Father did not provide any documentation to show they completed treatment. The court noted that Mother and Father's improvements were "too little too late."

Even if the court had found that Mother had shown she was now fully complying with the case plan, compliance only occurred after the termination proceedings began. In another case, this Court affirmed a neglect finding where a father failed to demonstrate signs of improvement or compliance with his case plan until *after* the Department initiated the termination proceedings. *In re Doe*, 151 Idaho 356, 366, 256 P.3d 764, 774 (2011). Similarly, here the termination proceedings began in May 2013, and most of Mother's claimed progress is unproven and has occurred since then. Because the progress is recent, it does not outweigh the long track record of neglect of her children.

2. Substantial and competent evidence supports that trial court's finding that terminating Mother's parental rights was in the children's best interests.

When a trial court determines whether terminating parental rights is in the child's best interests,

> the trial court may consider the stability and permanency of the home, unemployment of the parent, the financial contribution of the parent to the child's care after the child is placed in protective custody, improvement of child while in foster care, the parent's efforts to improve his or her situation, and the parent's continuing problems with the law.

*In re Doe*, 156 Idaho at ___, 320 P.3d at 1270. Mother argues the trial court abused its discretion when it found IDHW presented clear and convincing evidence that termination was in the children's best interests because the trial court should have considered the children's unique bond with their parents and the fact that the parents love their children and their children love them.

13

The court found it was in the children's best interests to terminate Mother and Father's parental rights due to numerous factors. The court noted that terminating parental rights protected the children from isolation from their grandparents. The court also noted termination gave them a home free from alcohol and drug abuse, a financially stable environment, a clean and sanitary home, stability, and a situation where their health and welfare was not at risk. Substantial and competent evidence in the record supports these findings. As discussed above, Mother and Father's home had been unstable for over four years. They were incarcerated, evicted, and abused substances. They had trouble keeping a clean home. They did not attend the children's appointments and visits. Mother and Father missed multiple hearings, which shows they do not have their children's best interests as a main priority. The record also indicates that the children's Aunt could provide a stable home for the children to grow up in. This was based upon the time Aunt and Uncle had already spent with the children and positive reports from family members and IDHW. Thus, substantial and competent evidence in the record supports the trial court's finding that terminating Mother's parental rights was in the children's best interests.

In addition to this evidence, love does not always translate into the ability to discharge parental responsibilities. *Idaho Dep't of Health & Welfare v. Doe*, 149 Idaho 165, 171, 233 P.3d 96, 102 (2010). Here, Mother's love for her children does not override the court's finding that terminating Mother's parental rights was in her children's best interests. The court acknowledged the children and parents loved each other. However, the court stated that Mother and Father's testimony about love and a rich family life was contrary to testimony that they spent days in their bedrooms and that B.M. made dinner several times a week. Additional testimony indicated that B.M. and A.M. spent most of their time next door at their grandmother's and that Mother and Father would not call to check on them. S.M.'s doctor found S.M. failed to thrive with Mother and Father and that his condition improved in foster care. Hence, substantial and competent evidence in the record supports the trial court's finding that terminating Mother's parental rights was in the children's best interests despite the love between Mother and her children.

**B. The trial court properly considered Mother's disabilities and IDHW's services.**

Mother argues the trial court failed to consider her disabilities and the IDHW's lack of meaningful supportive services. Mother argues that IDHW should have provided her additional services given her disabilities. She states that her disabilities include a loss of memory from a stroke she suffered after S.M. was born, which she made IDHW aware of early in the case. She

14

asserts that IDHW did not concern themselves with her counseling progress or how her memory and disabilities affected her visitation and her ability to keep a sanitary home. She contends that she also suffered from bi-polar disorder, irritable bowel syndrome, post-traumatic stress disorder, and migraines.

First, the trial court did consider Mother's disabilities in its decision. The court noted that Mother reported a stroke that affected her memory. However, the court pointed out that Mother put no medical testimony on at trial about how the stroke impacted her. The court concluded that because Mother had provided no medical testimony about her stroke, the court could not conclude that her stroke was the reason she had trouble with her memory. The court noted that the evidence suggested that her memory issues might also be drug-related. As an example, the court used Mother's failure to remember shoplifting after she had taken a large amount of prescription drugs. The court acknowledged that Mother testified that she had bi-polar disorder, but one of Mother's treating doctors instead testified it was major depressive disorder. The court noted Mother testified that her stroke and mental health condition did not affect her ability to clean and maintain the home. She instead stated that it only affected her ability to keep appointments. Therefore, the court did consider her disabilities, but also considered the fact that they were self-reported and occurring in conjunction with her drug and alcohol problems.

Second, there is no evidence that IDHW failed to provide meaningful supportive services to the family. "Not infrequently, this Court is presented with arguments that the Department did not do enough when the analysis should primarily focus on what the putative parent did or did not do." *Idaho Dep't of Health & Welfare v. Doe*, 150 Idaho 88, 91, 244 P.3d 232, 235 (2010). That is the case here.

Mother contends that IDHW was aware of her stroke and her memory troubles, but offered her no special assistance in complying with her plan. Mother asserts that IDHW only provided her a written visitation schedule and did not follow up with additional contact to help her overcome her disabilities. The court instead found that Mother had not taken advantage of IDHW's services and instead blamed others. Substantial and competent evidence supports this finding. Numerous witnesses testified that IDHW made repeated efforts to help the family. The case manager testified that she returned Mother's phone calls. Other social workers added that the case manager and other IDHW employees also returned phone calls, provided written schedules, and reminded Mother after every visitation of when the next visit was. The court

15

found that throughout the case, Mother constantly blamed others rather than taking responsibility for the things she had control over. Indeed, one of Mother's treating providers at counseling testified that Mother took little responsibility for the things she had control over. This lack of responsibility permeated Mother's testimony at trial, where she very rarely took any responsibility for her actions. Additionally, at many hearings over the case's life, the court found that IDHW provided reasonable efforts to reunify the parents with their children. The record indicates IDHW provided the parents visitation, drug testing, mental health counseling, and other services. Thus, the court properly considered IDHW's services and found IDHW made reasonable efforts.

The trial court properly considered Mother's disability and the IDHW's efforts, and substantial and competent evidence supports the trial court's judgment that clear and convincing evidence supported termination of Mother's parental rights due to neglect and the children's best interests. Therefore, the trial court did not err in terminating Mother's parental rights.

## V. CONCLUSION

We affirm the trial court's judgment terminating Mother's parental rights. Costs to IDHW.

Justices EISMANN, J. JONES, HORTON and WALTERS, J., Pro Tem, **CONCUR.**