# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 47534

In the Interest of:  John Doe I,
A Child Under Eighteen (18) Years of Age.
-----------------------------------------------------
STATE OF IDAHO, DEPARTMENT OF
HEALTH AND WELFARE,

   Petitioner-Respondent,

v.

JOHN DOE (2019-39),

   Respondent-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, February 2020 Term

Opinion Filed: April 16, 2020

Karel A. Lehrman, Clerk

---

Appeal from the District Court of the First Judicial District, State of Idaho, Shoshone County. Barbara A. Duggan, Magistrate Judge.

The judgment of the magistrate court is <u>affirmed</u>.

Daniel K. Sheckler, Sheckler Law Office, PLLC, Coeur d'Alene, for appellant John Doe.

Denise L. Rosen, Deputy Idaho Attorney General, Coeur d'Alene, for respondent, State of Idaho.

---

STEGNER, Justice.

This case arises from an appeal of the termination of a father's right to parent his son. John Doe I (Child) was removed from the care of his paternal grandmother (Grandmother) and his father, John Doe (Father) after a referral was made to the Idaho Department of Health and Welfare (the Department). The Department petitioned to terminate Father's parental rights. Father failed to attend scheduled hearings, ceased communicating with the Department, and only sporadically contacted his attorney. Father's counsel sought several continuances, but eventually the termination trial proceeded. Following trial, the magistrate court found that Father had failed to comply with the case plan and was unable to discharge his parental responsibilities. The magistrate court found it was in Child's best interests to terminate Father's parental rights. Father's main

1

argument on appeal is that the magistrate court abused its discretion in allowing the Department to amend its petition to terminate by adding a separate, alternate basis for termination, and by granting only a two-week continuance to Father to respond to this alternate theory. For the reasons set out below, we affirm the decision of the magistrate court.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Child's removal from home and the first year of proceedings.

On September 23, 2017, the Department received a referral about three-year-old Child. In 2016, Child had been placed by the Department with his paternal grandmother (Grandmother) pursuant to an out-of-home safety plan.[1] Grandmother made the September 2017 referral because of her concerns that Child was exhibiting behavior involving self-injury, and because she did not want permanent guardianship of Child.[2] Grandmother indicated that she would return Child to the care of his parents. Grandmother's guardianship of Child was dissolved on October 2, 2017.

On November 3, 2017, the Department received information that Child was now living with his maternal great-grandmother (Great-Grandmother). Within two weeks, the local police department contacted the Department, expressing concern that Child was in his mother's (Mother) company while she was publicly under the influence.[3] When contacted, Great-Grandmother reported that Mother was living with her and Child. Mother stated she had no interest in working with the Department. Approximately three weeks later, Great-Grandmother told the Department that she also could not take care of Child. She reported that Mother had "taken off with a new boyfriend" and that Child had been returned to Grandmother. When Grandmother was contacted, she admitted that Father cared for Child at night while she watched Child during the day, and reported that Father was in the process of being evicted from his trailer. She reiterated that she could not take care of Child. On December 1, 2017, the Department filed a motion seeking an order of removal to place Child in the Department's custody. The magistrate court granted this motion, and Child was placed in shelter care.

---

[1] The record does not clearly indicate why the earlier out-of-home safety plan was necessary, but at the time of the 2017 referral, Father and Mother were not in compliance with the case plan to have Child returned to either of them. As of December 2017, the Department had received eight prior referrals related to the family, with three assessments for neglect. Although Mother and Father never married, they had been involved in a relationship for more than fifteen years. This relationship was described by Mother as turbulent, involving frequent incidents of domestic violence.

[2] These self-injuring behaviors included Child banging his head on the ground. This behavior was also witnessed by Child's future foster parents, in which he would hurt himself by scratching his own face, hitting his head on the wall, and throwing himself down on the ground. This behavior would increase following visits with Mother and Father.

[3] The record does not reveal what substance Mother was under the influence of, but Mother's self-reported substance of choice is methamphetamine, which she had used regularly from young adulthood.

The shelter care hearing was held on December 5, 2017. Father was present at this hearing. Father did not agree with Child being in the Department's custody, and left the hearing while Grandmother testified. Grandmother repeated that she could not take care of Child. She observed that Child appeared very insecure when he stayed with Father, preferring the stability at Grandmother's house. Grandmother characterized the relationship between Father and Mother as "chaotic and violent," expressing significant concern about Father's ability to provide a stable home environment because Father had been diagnosed with paranoid schizophrenia, and she did not know if he was taking his medications. At the close of the hearing, the magistrate court determined that it was in Child's best interests to stay in the custody of the Department pending an adjudicatory hearing.

The adjudicatory hearing was held on January 4, 2018, and continued to January 8, 2018. Father was present at this hearing. The owner of the trailer park in which Father lived testified, stating that Father had been formally evicted but had not yet been removed from the property. The trailer park owner stated he was concerned for his own safety when he interacted with Father. Grandmother testified again, repeating her concerns regarding Father's ability to parent based on his deteriorating mental health. Father also testified at this adjudicatory hearing, stating that while he had several disabilities, they did not affect his ability to parent. He said that he had not seen a doctor for his paranoid schizophrenia in about nine months.

At the close of the January 8, 2018, adjudicatory hearing, the magistrate court determined that Child lacked a stable home environment. The court observed that Mother's substance abuse and Father's untreated mental illness were issues that needed to be addressed before Child could be returned to either of them. Accordingly, Child was to remain in the Department's custody. A case planning hearing was set for February 5, 2018, but counsel for Mother and Father did not receive proper notice, and the hearing had to be continued. Once again, on February 12, 2018, the case planning hearing was continued because neither parent had met with their respective attorneys regarding the proposed case plan.

The case planning hearing was finally held on February 14, 2018. Mother and Father were present. The magistrate court observed that neither parent had contributed to the proposed case plan during the Family Group Decision-making Meeting. The case plan identified several areas of concern for Father, in particular Father's (1) unstable housing situation and (2) untreated mental

illness.[4] While Mother agreed to adopt the case plan, Father refused to sign the plan, arguing that there was no basis for requiring drug and alcohol evaluation. He did not agree to have the results of any psychological evaluations forwarded to the Department. He also demanded a different attorney. The magistrate court granted Father's request to dismiss his appointed counsel. Father would then be appointed a conflict public defender in May 2018. Notwithstanding Father's objections, the magistrate court adopted the case plan.

Neither parent participated in visits with Child for the first four months that Child was in the custody of the Department. However, Father participated in several visits between April and late June 2018, during which Father lived in Grandmother's home.[5] Over the course of the three in-home visits, the assigned social worker (Social Worker) observed "a very sharp decline in the quality of the home, the consistency of the visit[s] in the home, and [Father's] overall mental stability." During the second visit, for example, Father was very distant, would not make eye contact with Child or with Social Worker, and began to make inappropriate comments to Child about the circumstances of Grandmother's death. During the third visit, the lower level of Grandmother's split-level home was entirely flooded. Again Father appeared distant and disengaged during the visit. At the end of the third visit, Child ran away and hid under a bed, and Social Worker observed Father grab Child by his legs to pull him out from underneath the bed. As Social Worker took Child to the car, Father began to grab all of Child's possessions still in Grandmother's home, and threw them into Social Worker's car, making comments like, "[d]on't worry, I'm going to come get you. We're going to a new home in Elko, Nevada." Child exhibited pronounced self-injury at the end of these visits, scratching his own face with his fingernails.

Father participated in two community visits, which also deteriorated in quality. The first occurred in early June 2018, and was held in a local park. The second community visit occurred on June 29, 2018, and ended with law enforcement involvement. Father arrived late to the visit, and reacted in an "intimidating" manner when asked about a recent UA, which had tested positive

---

[4] Father had previously been diagnosed as suffering from paranoid schizophrenia, and was the subject of several referrals to the Department, some of which had been made by Father himself. These included Father's reports that there were lasers outside his trailer, that he was being wiretapped, and that there were holes in his trailer where unknown people had been "gang banging it." Father had also called the child abuse hotline to report he had been raped by a member of the NSA. Father had further contacted his landlord to report that there was a woman crawling around and under his trailer, planting drugs. Equally of concern to the Department was a bizarre February 2018 package that Father had mailed to the safety assessor at the Department, including a check for one hundred thousand dollars signed by Father. The check was made out to "KIDNAPPERS" with the memo, "Ransom 4 [Child]."

[5] Grandmother died sometime in early 2018, although the precise date is unclear from the record.

for methamphetamine.[6] When Father was informed by Social Worker that the visit would end in fifteen minutes, Father became "very angry and yelled obscenities" at Social Worker. Social Worker gave Father the fifteen minutes promised. However, when Father was told that he needed to have his friends pick him up, Father became furious, and despite Social Worker's attempts to calm him down, became verbally and physically aggressive while trying to take Child away from Social Worker. Social Worker called 911 while Father continued to shout. Social Worker ultimately was able to buckle Child into his car seat, despite Father charging at and throwing toys at him. When police arrived, Father was arrested for misdemeanor battery, and subsequently spent time in jail. A no-contact order prohibiting contact with Social Worker was also entered against Father.

## B. The second year of proceedings and Father's failure to engage with the Department, court proceedings, or Child.

According to the Department, Father ceased all contact with the Department on June 29, 2018. Although the Department tried to keep him apprised of the case plan requirements, he refused all visits and certified mail from the Department. He also did not visit Child after the visit on June 29, 2018.

Father was present at the August 6, 2018, review hearing, during which Father's counsel confirmed that he had been sharing reports from the Department with Father. However, at the October 15, 2018, review hearing, Father was not present; Father's counsel stated that Father had not been in contact with him. Father did not appear for the November 19, 2018, permanency status hearing, and Father's counsel stated that all mail to Father had been returned. At the February 4, 2019, review hearing, Father's counsel again stated he had not heard from Father and did not know why Father was not present.

The Department filed a petition to terminate the parental rights of Mother and Father on February 25, 2019. By this time, Father had not been in contact with the Department or shown up in court for more than six months. On March 11, 2019, an affidavit of service was filed, stating that the Department's petition and summons had been personally served on Father a week prior on March 4, 2019. However, the e-filing of this petition to terminate did not include the second page of the petition, and the return of service did not indicate how many pages had been served

---

[6] Despite being referred on nine different occasions to produce a urine sample, this was the only test Father actually provided, and as noted, it was positive for methamphetamine.

on Father.

A status hearing was held on May 13, 2019, at which Father did not appear. Father's counsel stated he had not reviewed the petition with Father due to having had no contact with him. At this time, the termination trial was set for June 26, 2019. Father filed an answer to the petition to terminate on June 10, 2019; this filing was the first recognition by any party that the second page of the petition to terminate was missing.

The termination trial began on June 26, 2019. Father again was absent. Father's counsel stated he had received a phone call from Father a few weeks earlier, during which Father had provided him with a new address. However, Father did not want that address revealed, and instead wanted to appear telephonically at the termination trial. The magistrate court denied Father's motion to make a telephonic appearance, observing that Father "ha[d] received at the outset of the case what his rights, responsibilities, and potential outcomes could be. [Father] was duly served, [and] made aware of the petition for termination."

Before testimony began, the Department offered several exhibits into evidence, including the case plan.[7] The case plan was admitted without objection from Father.

The Department put on testimony from the foster parent, who was cross-examined by both Mother's and Father's counsel. The Department then called Social Worker to testify. During the direct examination of Social Worker, the Department sought to ask Social Worker questions about the case plan, which had been previously admitted. Father's counsel objected on the basis of relevance to this line of questioning, arguing that the original basis for termination was inability to discharge parental responsibilities, "not for failure to follow a case plan." The magistrate court overruled the objection, reasoning that the case plan's contents were "related to the ability or inability to discharge parental responsibilities and potentially what the [D]epartment identified as areas of concern."

During a brief recess in the termination trial, Father's counsel received a phone call from Father. After the recess was over, Father's counsel moved for a continuance because Father wanted to present evidence. The Department asked the magistrate court to deny it for lack of good cause. The magistrate court detailed how Father had not participated in the proceedings. When the court asked Father's counsel for evidence or information that would support a request for a continuance,

---

[7] In describing the case plan exhibit, the Department characterized it as "a copy of the case plan for the mother." However, the case plan described areas of concern and tasks for both Mother and Father.

Father's counsel stated that he could not provide any affidavit of counsel to support good cause. Father's counsel nonetheless stated that Father was disabled and out of state, but wanted to testify that he could provide a stable home life with financial security for Child.

The magistrate court denied this requested continuance, stating that Father had received notice, but had "made his choice to be absent . . . to not further assist counsel." The court pointed out that Father had not maintained contact with the Department for nearly a year. Accordingly, the magistrate court found Father had failed to establish good cause to continue the trial.

The Department's examination of Social Worker proceeded. Father's counsel also cross-examined Social Worker. After redirect examination, the Department indicated that it had no further witnesses. However, the Department then moved to amend its petition for termination, specifically to add an additional, separate basis to terminate as a result of Father's purported failure to comply with the case plan. The Department's counsel argued that "the evidence provided today supports that amendment. There is not prejudice from the State's position for the defendant. . . . He's not been a participant. He is fully aware that there was a case plan that he was to comply with and he did not."

Father's counsel opposed the amendment, arguing that he had "received a petition that sought termination of his parental rights on very narrow, specific grounds being failure to adequately parent." He contended that the Department's argument was "speculative" because it did not include any evidence about Father in the prior year. Father's counsel also maintained that if the amendment were permitted, a continuance should be permitted to allow Father to respond.

The magistrate court pointed out that I.R.C.P. 15(b)(1) states that a court should freely permit an amendment. In discussing prejudice to Father's case, the court pointed out that the case plan had been admitted by stipulation at the beginning of the termination trial,[8] and that Father had been given full opportunity to engage in the case plan, but had chosen not to do so. Further, Father's counsel had been given full opportunity to cross-examine Social Worker about the case plan.

At this point, a brief recess was allowed during which the magistrate court reviewed the petition for termination. The magistrate court only then became aware of the missing page in the petition for termination. The magistrate court then granted the Department's motion to amend the

---

[8] Although the magistrate court referred to the case plan as having been admitted by stipulation, it was admitted without objection.

petition, but also granted another continuance because there was no evidence as to how many pages had been delivered to Father. The magistrate court granted the continuance for two weeks, asking Father's counsel if that was sufficient. When Father's counsel expressed concern about having enough time to provide notice to Father, the court noted that Father's counsel had Father's physical address and could have him personally served, followed by certified mail, "[s]o you give your client the complete amount of time available to him." Father's counsel agreed, and the court authorized expenditure for a courier service to serve Father. The continuation of the trial was scheduled to resume July 10, 2019, two weeks later. The court admonished Father's counsel that this date was "a hard date for [Father] to appear."

On July 10, 2019, the termination trial continued. Father was again not present. Father's counsel explained that he had mailed Father notice, spoken with Father on the phone, and discussed the contents of the amended petition with him. However, Father had ceased communication shortly after their phone call. Father's counsel moved for a continuance, arguing that under *Mathews v. Eldridge*, 424 U.S. 319 (1976), a continuance would give Father more opportunity to contest the evidence against him.

The magistrate court denied this motion. The magistrate court first observed that the matter had been pending for 586 days, noting that while the administrative burden was low in continuing, the interest of the government in providing "security, safety, stability, . . . long-term ability for the best interest of the child to be served" was very high.

Father's counsel had no witnesses or evidence to submit. After the Department rested, Father argued in closing that the evidence relied on by the Department was "somewhat speculative" regarding Father's ability to discharge his responsibilities: "There just hasn't been enough contact with him to prove that beyond clear and convincing evidence." The matter was then submitted to the court.

**C. The magistrate court's decision and termination of Father's right to parent Child.**

On October 21, 2019, the magistrate court entered its findings of facts, conclusions of law, and memorandum decision. The magistrate court identified the two grounds for termination as (1) Father's inability to discharge parental responsibilities, and (2) Father's failure to comply with the case plan. The magistrate court then detailed the evidence presented as to Father's lack of compliance with the case plan. Relying on the testimony of Social Worker and the case plan, the magistrate court identified the areas in which Father had failed to comply with the case plan: (1)

failure to establish stable housing; (2) failure to address his untreated mental illness; (3) failure to comply with the law; and (4) failure to abstain from use of illegal substances.

The magistrate court found that Father had failed to sufficiently comply with the case plan. The court found that Father had provided no information about his housing status, and had not shown that he had obtained a psychological evaluation or was receiving treatment for his previously diagnosed paranoid schizophrenia. The court also detailed Father's visits with Child, observing that Father had not been involved with Child's medical or well-being appointments. The court found that Father had not substantially complied with the task requiring him to comply with local, state, and federal law, noting that Father had over forty criminal cases, eleven active warrants, and seven protection orders issued against him. The court also found that Father's failure to perform random drug tests, except for one which was positive for methamphetamine, was failure to substantially comply with the case plan. The court concluded that "[i]t would be completely unsafe to the child to return to [Father]."

The magistrate court also found that the Department established neglect under the definition in Idaho Code section 16-1602(31). *See* I.C. § 16-1602(31)(b) (defining a "neglected" child as one "[w]hose parents . . . are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being"). The magistrate court found that Father was unable to discharge his parental responsibilities by clear and convincing evidence, and that Father's "inability to parent will continue for a prolonged, indeterminate time." The magistrate court observed that Father had not visited Child for over a year, and had engaged in distressing behavior during his last visit.

> There is no indication of regular gainful employment and there is nothing in the record that supports him addressing his own mental health issues. [Father's] criminal record and unwillingness to address his pending warrants is not irrelevant to his parenting. His criminal record is a component of his character, and is predictive of how he will behave in the future. . . . [Father] has not demonstrated he can be a stable caretaker for [Child]. [Father] has not worked with the Department to address concerns with substance use nor his mental health.

The magistrate court then found that it was in Child's best interests to terminate Father's parental rights.

Father timely appealed.

## II.    STANDARD OF REVIEW

"[T]his Court reviews a trial court's decision to grant or deny a motion to amend the

9

pleadings for an abuse of discretion." *Zeyen v. Pocatello/Chubbuck Sch. Dist. No. 25*, 165 Idaho 690, 694, 451 P.3d 25, 29 (2019) (citation omitted). Likewise, "[a] trial court's decision to grant or deny a continuance will not be overturned unless the decision was an abuse of discretion." *In Interest of Doe (2018-24)*, 164 Idaho 143, 146, 426 P.3d 1243, 1246 (2018) (citing *Estate of Ekic v. Geico Indem. Co.*, 163 Idaho 895, 897, 422 P.3d 1101, 1103 (2018)).

Whether a trial court has abused its discretion is an inquiry into "whether the trial judge: (1) [c]orrectly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 867, 421 P.3d 187, 198 (2018).

> On appeal, this Court will not disturb the magistrate court's decision to terminate parental rights if there is substantial, competent evidence in the record to support the decision. Substantial, competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. This Court is required to conduct an independent review of the magistrate court record, but must draw all reasonable inferences in favor of the magistrate court's judgment because the magistrate court has the opportunity to observe witnesses' demeanor, to assess their credibility, to detect prejudice or motive and to judge the character of the parties.

*In re Doe I*, 165 Idaho 33, 39, 437 P.3d 33, 39 (2019) (quoting *Idaho Dep't of Health & Welfare v. Doe*, 150 Idaho 36, 41, 244 P.3d 180, 185 (2010)).

## III. ANALYSIS

### A. The magistrate court did not abuse its discretion in permitting the Department to amend its petition to terminate.

The Department's original petition was e-filed; however, the electronic document did not contain the second page of the petition. Consequently, this page is also missing from the record on appeal. However, the third page—which was present in the e-filing—contained the following grounds for removal:

> a. The parents are unable to discharge parental responsibilities and such inability will continue for a prolonged, indeterminate period and will be injurious to the health, morals or well-being of the child and/or;
>
> b. Termination is in the best interest of the child[.]

At the June 26, 2019, termination trial, after the Department examined its last witness, it also moved to amend its petition

> to include a grounds for termination – actually the neglect by failing to comply with the case plan, which is subsection 16-2002(3)(b) at this point. It's – the evidence

10

provided today supports that amendment. There is not prejudice from the State's position for the defendant. He has filed an unverified answer. He's not been a participant. He is fully aware that there was a case plan that he was to comply with and he did not.

Over objection by Father's counsel, the magistrate court granted the motion to amend. The magistrate court also allowed a two-week continuance.

On appeal, Father's counsel argues that the language of the petition "was inadequate to give Father notice that he was on trial for failure to follow the case plan." Father argues that it was an abuse of discretion for the magistrate court to allow the petition to be amended "when the issue was not tried by the express or implied consent of the [F]ather, and when Father's defense on the merits was prejudiced" by the decision. Father argues that the amendment did not help the Department prove the original basis for termination—Father's inability to discharge his parental responsibilities. Father also argues that he was prejudiced because he was unprepared to litigate the additional basis for termination, i.e., that he was unable to conduct discovery, investigate, or subpoena witnesses.

The Department argues that the magistrate court properly permitted the amendment under Idaho Rule of Civil Procedure 15(b)(1). First, the Department argues that Rule 15(b)(1) properly applied because Father had objected to admission of evidence—the case plan—on the basis that it was irrelevant to the originally pleaded grounds for termination.[9] Second, the Department further argues that the magistrate court correctly concluded that Father had not established prejudice to his case, quoting the magistrate's court's lengthy reasoning.

In response, Father contends—without providing any authority—that "[a] motion to amend the pleadings pursuant to Rule 15(b)(1) may only be made when doing so will aid in the presentation of the merits of a theory previously plead, albeit inadequately plead." Because "the merits were the original claim that Father was unable to discharge his parental responsibilities[,]" Father argues that "an entirely new theory" could not be added by amendment under Rule 15(b)(1). Alternatively, Father contends that the magistrate court did not exercise reason in its analysis of prejudice under Rule 15(b)(1). Father asserts that the magistrate court should have evaluated

---

[9] As noted above, the case plan was originally admitted without objection; however, when the Department sought to examine Social Worker during the termination trial, Father's counsel objected to use of the case plan in this manner as irrelevant to the original grounds for termination as to Father's rights. Accordingly, on appeal the Department's argument focuses on Father's objection to the evidence as the trigger for a Rule 15(b)(1) motion to amend the petition to terminate.

11

Father's "inability to prepare and present evidence on a new theory on such short notice—not the likelihood of how the evidence will be weighed by the [magistrate court]."

Rule 29 of the Idaho Juvenile Rules states that "[t]he Idaho Rules of Civil Procedure shall apply to C.P.A. proceedings to the extent that they are not inconsistent with these rules, statutes, or the law." I.J.R. 29. Idaho Rule of Civil Procedure 15(b) provides for the amendment of pleadings during and after trial. *See* I.R.C.P. 15(b). A pleading may be amended based on an objection at trial if "a party objects that evidence is not within the issues raised in the pleadings[.]" I.R.C.P. 15(b)(1). Amendment should be freely permitted "when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits." *Id.* However, where "an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." I.R.C.P. 15(b)(2). In that instance, "[a] party may move, at any time, even after judgment, to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue." *Id.* These are two separate factual scenarios: one is triggered by a party's objection at trial, while the other requires a trial court to find that the issue has been tried by the parties' express or implied consent. *See generally* I.R.C.P. 15(b).

Father's argument that an amendment under Rule 15(b) must "aid in the presentation of the merits of a theory previously plead, albeit inadequately plead[,]" is unconvincing. As early as 1970 we held that "I.R.C.P. 15(b) does not bar amendments which change the cause of action or theory of the case." *Cameron Sales, Inc. v. Klemish*, 93 Idaho 451, 455, 463 P.2d 287, 291 (1970). The extent to which we examine the differences between what has been pleaded and what has not is limited to the *prejudice* inquiry; for example, we held that Rule 15(b) permitted the addition of a claim for a prescriptive easement to a claim of adverse possession, reasoning that the "unpleaded theory relie[d] on less evidence than [the] pleaded theory and result[ed] in less relief to the moving party." *Hughes v. Fisher*, 142 Idaho 474, 484, 129 P.3d 1223, 1233 (2006).

Further, given our liberal notice pleading standard, it does not make sense to limit Rule 15(b) amendments to only those narrow instances where addition of an unpleaded issue will assist in litigating the merits of a *previously pleaded* issue. "The purpose of Rule 15(b) is to allow cases to be decided on the merits, rather than upon technical pleading requirements." *Id.* at 483, 129 P.3d at 1232 (citation omitted); *see also Brown v. City of Pocatello*, 148 Idaho 802, 807, 229 P.3d 1164,

1169 (2010) (citation omitted) ("The technical rules of pleading have long been abandoned in Idaho[.]"). Were we to follow Father's view, we would dramatically reduce the effectiveness of Rule 15(b). Accordingly, we reject Father's argument that an amendment to the petition should only be permitted if the amendment were associated with a theory that had been originally pleaded. Such a holding would eviscerate the ability to amend a pleading.

Neither are we convinced that the magistrate court abused its discretion in allowing the petition to terminate to be amended. The magistrate court recognized it had discretion in the matter. The magistrate court acted within the boundaries of its discretion, identifying the legal standards it was constrained by when it identified the governing rule as I.R.C.P. 15(b)(1). The court acted consistently within the boundaries of its discretion, in particular the guidance of I.R.C.P. 15(b)(1) that it "should freely permit an amendment[,]" while also granting a continuance to allow Father to meet that evidence. *See* I.R.C.P. 15(b)(1).

The magistrate court also applied reason when it found that allowing the case plan evidence would not prejudice Father's action or defense. The court reasoned that the case plan had been previously admitted and Father's counsel had had a full opportunity to question the case plan and Father's compliance with it. The magistrate court pointed out that Father had refused to engage in planning or complying with the case plan, observing that Father's counsel had been "placed in a unique position by [his] client's failure to engage[.]" Nonetheless, the magistrate court concluded that the case plan was reasonable and that Father failed to establish prejudice. Even on appeal, Father's counsel has failed to identify prejudice other than in the abstract. The magistrate court did not abuse its discretion in its decision. It follows that the evidence Father could have presented to challenge the second basis for parental termination (neglect through failure to follow the case plan) would have been the same as evidence that Father presented to challenge the first basis (inability to discharge parental responsibilities). Father had every opportunity to participate in and craft the case plan, and Father's counsel had every opportunity to cross-examine Social Worker to establish whether Father had complied with it. In essence, Father's position is that the magistrate court should somehow blind itself to Father's lack of engagement in this process. To reject the amendment would not result in a decision on the merits. *See* I.R.C.P. 15(b)(1). Accordingly, we affirm the magistrate court's decision permitting the petition for termination to be amended.

**B. The magistrate court did not abuse its discretion in denying Father's second request for a continuance to respond to the amended petition.**

After permitting the Department to amend its petition to terminate, the magistrate court

13

also granted a continuance for two weeks so that Father could respond to the evidence against him. When asked if this was sufficient, Father's counsel equivocated:

> [FATHER'S COUNSEL]: Your Honor, I will – I will send notice to my client. I would anticipate that there would be seven days for mailing. I will make effort to contact him by telephone although –
> THE COURT: You have his physical address. You can have him served by a process server in a much shorter period of time, and you can follow that up with a certified mail service.
> [FATHER'S COUNSEL]: I certainly will.
> THE COURT: So you give your client the complete amount of time available to him.
> [FATHER'S COUNSEL]: That makes sense, your Honor. Thank you for the suggestion.

Further, the magistrate court authorized Shoshone County to pay for a courier service. Father did not raise any additional concerns that two weeks was insufficient to respond to the additional ground for termination in the amended petition. The magistrate court stated unequivocally that Father should be present, and that if Father appeared and there was a need for additional time for Father to present evidence, the court would make that time available.

At the subsequent termination proceeding, on July 10, 2019, Father failed to appear. Father's counsel stated that he had been in contact with Father for a few days after the June hearing, but had lost contact in the preceding week. Father's counsel stated, however, that Father had "wanted as much time as he could have to respond to these allegations." Father's counsel asked for a continuance, arguing that due process would be violated were it not granted. The magistrate court denied this motion, acknowledging first that the right to a parent-child relationship is a fundamental right. The magistrate court also recognized that it would be a small burden on the Department to continue the hearing, but pointed out that the Department also had an interest in adjudicating the case in Child's best interests. The magistrate court rhetorically asked how long the case should be extended to see if Father would appear. The magistrate court then denied the motion to continue.

On appeal, Father argues that the length of time given for the first continuance—two weeks—was insufficient. Father argues that because the Idaho Rules of Civil Procedure provide for twenty-one days for a party to respond to a pleading, that the fourteen days allowed were insufficient because they did not give Father reasonable opportunity to investigate, conduct discovery on the new issue, and to marshal evidence. Father further argues that because the denial of the continuance prejudiced his substantial rights, this Court should reverse the magistrate court.

14

The Department counters that Father and his counsel were informed of what would occur if Father did not appear. The Department asserts that the trial court did not abuse its discretion because it recognized its discretion, acted within the boundaries of its discretion, and provided a well-reasoned analysis in weighing the options. In response, Father asserts that conditioning the continuance on Father's physical presence did not show an exercise of reason, and consequently reflected an abuse of discretion.

"The decision whether to grant a motion to continue trial is within a trial court's sound discretion." *In re Doe (2016-31)*, 161 Idaho 393, 397, 386 P.3d 916, 920 (2016) (citation omitted). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *State v. Richardson*, 95 Idaho 446, 448, 511 P.2d 263, 265 (1973) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

As a preliminary matter, the magistrate court granted Father's first motion to continue. Father did not sufficiently object to the length of the continuance granted, and provided no reason to the magistrate court as to why two weeks would be inadequate. "[B]oth the issue and the party's position on the issue must be raised before the trial court for it to be properly preserved for appeal." *See State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019). Accordingly, Father has not preserved his challenge to the length of time afforded after his first requested continuance.

As to Father's second motion to continue at the subsequent termination trial, the magistrate court did not abuse its discretion in denying Father's motion to continue. The magistrate court recognized its discretion in deciding whether to grant a continuance. The magistrate court also addressed Father's due process arguments, addressing the relevant factors identified in *Mathews v. Eldridge*, 424 U.S. 319 (1976), before concluding that due process did not require a continuance. The magistrate court also pointed out that Father had placed his own counsel in the position of arguing for a continuance without indicating why the continuance would be necessary. Given the record before the magistrate court, Father's refusal to communicate with the Department, his failure to appear at the various hearings, and the unsupported reasons Father provided for a continuance, we cannot say that the magistrate court abused its discretion.[10] Accordingly, the

___

[10] We are unpersuaded by Father's argument that the magistrate court "conditioned" granting a continuance on Father's presence at the hearing. The length of the July 10, 2019, hearing was explicitly predicated upon how much evidence

magistrate court's decision to deny Father's second motion to continue was not an abuse of discretion, and we affirm.

**C. Substantial and competent evidence supports the magistrate court's decision terminating Father's parental rights on the basis that Father was unable to discharge his parental responsibilities.**

Following the trial, the magistrate court issued a lengthy memorandum decision with findings of fact, conclusions of law, and an order terminating Father's parental rights. In it, the magistrate court held that both grounds for termination had been established by clear and convincing evidence.

On appeal, Father challenges the magistrate court's finding that Father was unable to discharge his parental responsibilities. Father argues that it was speculative to conclude anything about Father's present abilities to discharge his parental duties based on outdated information. In response, the Department points to Social Worker's testimony, arguing that the evidence available that Father had neglected his son *was* essentially uncontradicted. Father counters, arguing that substantial evidence does not support the magistrate court's decision because the evidence "was so stale." Father argues that the only available evidence was from 2018, "only giv[ing] a mere suspicion of [Father's] inability to discharge parental responsibilities at the time of the 2019 hearing."

"Termination is only appropriate if an enumerated ground for termination exists and termination is in the child's best interests." *In re Doe (2013-15)*, 156 Idaho 103, 110, 320 P.3d 1262, 1269 (2014) (citation omitted); *see also* I.C. § 16–2005(1). One such enumerated ground is the inability of a parent to discharge his parental responsibilities when "such inability will continue for a prolonged indeterminate period and will be injurious to the health, morals or well-being of the child." I.C. § 16-2005(1)(d).

> It is well established that appellate courts in Idaho do not reweigh evidence. *See, e.g.*, *State v. Doe*, 143 Idaho 383, 388, 146 P.3d 649, 654 (2006). Instead, we defer to the trial court's unique ability to "accurately weigh the evidence and judge the demeanor of the witnesses" and take into account the trial court's "superior view of the entire situation." [*Doe v. Roe*, 133 Idaho 805, 809, 992 P.2d 1205, 1209 (1999)] (citations omitted). Moreover, magistrate courts have "broad discretion in

Father's counsel had to present for his case. Further, the magistrate court clearly set out contingencies in the event more time was needed in order for Father to present evidence. What Father needed to establish prejudice in his case was evidence, and Father did not assist his counsel in procuring or presenting any. Accordingly, Father's counsel submitted no showing of what could have been presented if given more time. Father's counsel has made no showing as to what evidence Father was prevented from presenting as a result of the magistrate court's scheduling of this matter. Father's claims of prejudice are unsubstantiated.

16

determining whether evidence is or is not too remote" to be relevant to a termination action. *In re Dayley*, 112 Idaho 522, 525, 733 P.2d 743, 746 (1987).

*State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007).

Substantial and competent evidence supports the magistrate court's determination that Father was unable to discharge his parental responsibilities. First, although the circumstances for Child's original removal from Mother and Father are unclear from the record, Child had *already* been placed with Grandmother pursuant to an out-of-home safety plan when the referral giving rise to this case was made. Grandmother's primary concern in this September 2017 referral was that it would not be safe to put Child in Father's care, given his impending eviction and mental instability. Father was referred for drug testing nine times, and only performed one such urinalysis, during which he tested positive for use of methamphetamine. Despite acknowledging his diagnosis of paranoid schizophrenia, Father never established that he was receiving treatment or taking medication to control it. Following Father's eviction from his housing, his only consistent housing was at Grandmother's house following her death, and the quality of this home environment declined dramatically over the three months he lived there. Father only engaged with the Department for visitation for a period of three months, during which the quality of his visits were observed to sharply deteriorate. Ultimately, Father was incarcerated as a result of a criminal assault on Social Worker during a visitation with Child. After this incarceration, Father refused to contact the Department or cooperate in Child's case in any way. Except for when Father was jailed, he could not establish where he was, what he was doing, or that he had any means of providing for himself, much less for Child. Father also had multiple active warrants out for his arrest, evidence that Father's stints in jail and run-ins with the legal system were likely to continue at least for some extended time.

Although Father complains on appeal that the evidence relied on by the magistrate court was too distant in the past to support the court's decision, we disagree for multiple reasons. First, we defer to a magistrate court's decision about what evidence is "too remote." *Doe*, 144 Idaho at 842, 172 P.3d at 1117. The "remoteness" of evidence speaks to the weight of evidence, not its relevance. *See id.* We do not reweigh evidence on appeal. *In re Dayley*, 112 Idaho at 525, 733 P.2d at 746. Second, "[s]ubstantial, competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion." *Matter of Doe I*, 165 Idaho at 39, 437 P.3d at 39 (quotation omitted). A reasonable mind would accept the available evidence to support the conclusion that Father's rapid decline between April and June 2018 showed his inability to

17

discharge his parental responsibilities. Third, the *bare minimum* for discharging parental responsibilities is presence in a child's life. After June 29, 2018, Father effectively removed himself from Child's life. He did not appear for a year's worth of hearings, demonstrating that he did not have Child's best interest as a main priority. *See In re Doe (2014-17)*, 157 Idaho 694, 703, 339 P.3d 755, 764 (2014). He did not stay in contact with his counsel over long stretches of time. Substantial and competent evidence supports the magistrate court's decision that Father was unable to discharge his parental responsibilities. Accordingly, we affirm the magistrate court's order terminating Father's parental rights.

## IV.     CONCLUSION

For the foregoing reasons, the judgment of the magistrate court is affirmed.

Chief Justice BURDICK, Justices BRODY, BEVAN and MOELLER CONCUR.