# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 50515

| | |
|---|---|
| In the Matter of: Jane Doe I, A Child Under Eighteen (18) Years of Age. | ) ) |
| STATE OF IDAHO, DEPARTMENT OF HEALTH AND WELFARE, | ) ) Filed: May 31, 2023 |
| | ) |
| Petitioner-Respondent, | ) Melanie Gagnepain, Clerk |
| | ) |
| v. | ) THIS IS AN UNPUBLISHED |
| | ) OPINION AND SHALL NOT |
| JANE DOE (2023-05), | ) BE CITED AS AUTHORITY |
| | ) |
| Respondent-Appellant. | ) |
| | ) |

Appeal from the Magistrate Division of the District Court of the Second Judicial District, State of Idaho, Latah County. Hon. Victoria Olds, Magistrate.

Judgment terminating Doe's parental rights, <u>affirmed</u>.

Lockett Law; Sandra D. Lockett, Moscow, for appellant.

Hon. Raúl R. Labrador, Attorney General; Briana R. Allen, Deputy Attorney General, Lewiston, for respondent.

HUSKEY, Judge

Jane Doe appeals from the magistrate court's order terminating her parental rights. Doe alleges the magistrate court erred in finding a statutory basis for terminating her parental rights and that termination is in the best interests of the child. Because substantial and competent evidence supports the magistrate court's findings, the judgment terminating Doe's parental rights is affirmed.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

Doe is the mother of the child involved in this action. Upon Doe's incarceration for assault,[1] the child was placed into foster care. Doe completed reunification services after her release from incarceration, and the child was placed back into her care. Thereafter, the Idaho Department of Health and Welfare (Department) received a report of concern for the child after she missed four consecutive days of school, had an unexplained sore on her face, and appeared dirty and disheveled during a subsequent home visit. The State filed a child protection petition, and the child was placed into foster care. After contested shelter care and adjudicatory hearings, the magistrate court awarded temporary custody of the child to the Department. The magistrate court ordered a case plan for Doe to complete as part of reunification efforts.

The magistrate court held regular review hearings while the child was in the Department's custody. Ultimately, the Department filed a petition to terminate Doe's parental rights to the child and the magistrate court held a hearing. Following the hearing, the magistrate court found by clear and convincing evidence that Doe: (1) neglected the child by leaving her without proper parental care and control necessary for her well-being; (2) neglected the child by failing to comply with the ordered case plan; and (3) is unable to discharge parental responsibilities for a prolonged period that will be injurious to the health, morals, or well-being of the child. The magistrate court also found that termination of Doe's parental rights is in the best interests of the child. Accordingly, the magistrate court terminated Doe's parental rights to the child. Doe timely appeals.

# II.

## STANDARD OF REVIEW

On appeal from a decision terminating parental rights, this Court examines whether the decision is supported by substantial and competent evidence, which means such evidence as a reasonable mind might accept as adequate to support a conclusion. *Doe v. Doe*, 148 Idaho 243, 245-46, 220 P.3d 1062, 1064-65 (2009). The appellate court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order that parental rights be terminated. *Id.* The Idaho Supreme Court has also said that the substantial evidence test requires a greater

---

[1] Doe's assault was committed against her ex-boyfriend, who is also the foster parent in this case. The criminal conviction resulted in a no-contact order being issued between Doe and the child's foster parents.

quantum of evidence in cases where the trial court's finding must be supported by clear and convincing evidence than in cases where a mere preponderance is required. *State v. Doe*, 143 Idaho 343, 346, 144 P.3d 597, 600 (2006). Clear and convincing evidence is generally understood to be evidence indicating that the thing to be proved is highly probable or reasonably certain. *Roe v. Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006). Further, the magistrate court's decision must be supported by objectively supportable grounds. *Doe*, 143 Idaho at 346, 144 P.3d at 600.

## III.

## ANALYSIS

Doe alleges the magistrate court erred in terminating her parental rights to the child. Specifically, Doe argues the magistrate court's findings that she neglected the child, was unable to discharge her parental responsibilities, and that termination of her parental rights is in the best interests of the child were not supported by substantial and competent evidence. In response, the State contends the district court did not err.

A parent has a fundamental liberty interest in maintaining a relationship with her child. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Doe v. State*, 137 Idaho 758, 760, 53 P.3d 341, 343 (2002). This interest is protected by the Fourteenth Amendment to the United States Constitution. *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007). Implicit in the Termination of Parent and Child Relationship Act is the philosophy that, wherever possible, family life should be strengthened and preserved. I.C. § 16-2001(2). Therefore, the requisites of due process must be met when terminating the parent-child relationship. *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). Due process requires that the grounds for terminating a parent-child relationship be proved by clear and convincing evidence. *Id*. Because a fundamental liberty interest is at stake, the United States Supreme Court has determined that a court may terminate a parent-child relationship only if that decision is supported by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *see also* I.C. § 16-2009; *Doe v. Dep't of Health & Welfare*, 146 Idaho 759, 761-62, 203 P.3d 689, 691-92 (2009); *Doe*, 143 Idaho at 386, 146 P.3d at 652.

Idaho Code § 16-2005 permits a party to petition the court for termination of the parent-child relationship when it is in the child's best interests and any one of the following five factors exist: (a) abandonment; (b) neglect or abuse; (c) lack of a biological relationship between the child and a presumptive parent; (d) the parent is unable to discharge parental responsibilities for a prolonged period that will be injurious to the health, morals, or well-being of the child; or (e) the

3

parent is incarcerated and will remain incarcerated for a substantial period of time. Each statutory ground is an independent basis for termination. *Doe*, 144 Idaho at 842, 172 P.3d at 1117.

**A.    The Magistrate Court Did Not Err by Finding Statutory Grounds Existed for Termination of Doe's Parental Rights**

The magistrate court found three statutory bases for termination of Doe's parental rights to the child. First, the magistrate court found that because of Doe's conduct or omissions, she neglected the child by leaving her without proper parental care and control necessary for her well-being. Second, the magistrate court found that Doe neglected the child by failing to comply with the case plan. Third, the magistrate court found Doe is unable to discharge parental responsibilities for a prolonged period that will be injurious to the health, morals, or well-being of the child. These findings are supported by substantial and competent evidence.[2]

**1.    Neglect**

Idaho Code § 16-2002(3)(a) defines "neglect" as any conduct included in I.C. § 16-1602(31). Section 16-1602(31)(a) provides, in pertinent part, that a child is neglected when the child is without proper parental care and control, or subsistence, medical or other care or control necessary for her well-being because of the conduct or omission of his or her parents, guardian, or other custodian or their neglect or refusal to provide them. Neglect also exists where the parent has failed to comply with the court's orders or the case plan in a Child Protective Act case and the Department has had temporary or legal custody of the child for fifteen of the most recent twenty-two months and reunification has not been accomplished by the last day of the fifteenth month in which the child has been in the temporary or legal custody of the Department. I.C. § 16-2002(3)(b).

**a.    Without proper care and control**

The magistrate court found that Doe neglected the child by failing to provide proper parental care and control necessary for her well-being because of Doe's conduct or omission. This finding is supported by substantial and competent evidence.

First, the testimony in this case indicates that Doe had a history of involvement with the Department concerning child protection matters. Glady Brewer, one of Doe's case managers, testified that the Department received twenty-three to twenty-four referrals about children in Doe's

---

[2]    Although the State alleged that Doe abandoned her child, the magistrate court did not find the State established abandonment as a statutory basis upon which to terminate Doe's parental rights. The State does not challenge this determination on appeal.

4

care and twenty of the referrals had been designated for assignment. Although Brewer testified that not all of the referrals concerned the child in this proceeding, all did involve Doe, and generally were concerns about physical abuse, neglect, substance abuse, and domestic violence. Brewer testified that these referrals resulted in at least one of Doe's other children being removed from her care.

Second, evidence presented at the termination hearing indicates there were concerns about Doe's ability to maintain sobriety around the child. Brewer testified that although Doe's substance abuse evaluation did not recommend treatment and Doe had provided negative urinalysis tests (UAs) during the course of the proceeding, this did not alleviate the substance abuse concerns. Doe's behavior during one visit with the child was indicative of methamphetamine use; her behavior during two visits was indicative of alcohol use; she refused to consistently engage in random UAs; and she delayed obtaining a court-ordered hair follicle test for four months.

Third, evidence indicates that Doe was unable to provide the child with the care and structure that she needed. Conner Edwards, the child's guardian ad litem, testified that Doe demonstrated both concerning and inappropriate behaviors with and around the child and Doe was unable to meet the child's basic needs. Edwards explained Doe had demonstrated an unwillingness to consistently take the child to school where she had access to necessary special educational programs; did not demonstrate appropriate behaviors around the child; and because Doe was unable to emotionally regulate her conduct, she put the child at risk of physical violence. Similarly, Brewer testified that she believed Doe neglected the child when Doe engaged in combative conversations with the child, refused to acknowledge the child's needs, and was unable to put the child's needs above her own. Taken together, Doe's history with the Department, her ongoing substance abuse concerns, and her inability to meet the child's needs provides substantial and competent evidence to support the magistrate court's finding that Doe neglected the child by failing to provide her with proper care and control due to Doe's own conduct or omissions.

### b. Failure to comply with case plan

The magistrate court found that Doe neglected the child by failing to comply with the case plan because Doe did not substantially comply with any case plan tasks and while she may have accomplished certain tasks, task completion was always on Doe's time, in her own way, and only if she felt it would be to her advantage. This finding is supported by substantial and competent evidence.

5

The first case plan task required Doe to schedule a psychological evaluation within fifteen days of the approved plan and complete the evaluation within thirty days. Sarah Hudnall, the first case manager assigned to the case, testified that Doe eventually completed a psychological evaluation but she did not complete it within the required time frame specified by the case plan.

The second case plan task required Doe to schedule and complete a substance abuse evaluation, cooperate with all aspects of the substance abuse assessment and treatments, including participating in drug testing, and remain clean and sober throughout the proceedings. Hudnall testified that while Doe completed a substance abuse evaluation, there were concerns with whether she maintained sobriety throughout the proceedings. Hudnall explained Doe was resistant to requests to participate in random UAs and delayed completing a court ordered hair follicle test for four months even though the order required it be completed within twenty-four hours of the order. These concerns continued when Brewer took over as case manager. Brewer testified that although Doe provided voluntary UAs that were negative for alcohol or illegal substances, she nonetheless had concerns about Doe's sobriety because the UAs were completed when Doe wanted to do them; Doe exhibited behavior which was indicative of substance use; her behavior improved when she was participating in random UAs and regressed when she was not; and she refused to continue to perform random UAs for a sustained period of time. Brewer also testified that at one visit, Doe appeared under the influence of methamphetamine, and at two others visits, Doe appeared under the influence of alcohol. Similarly, Edwards testified that he did not believe Doe remained clean and sober throughout the proceedings because, in part, she had one UA that was positive for alcohol.

A city police officer testified to seeing Doe intoxicated in public. The officer explained that in September 2022, he responded to a call from a local bar alerting him to a person who was trespassing in the establishment. When he arrived at the bar, he learned Doe was the subject of the call and she appeared so intoxicated that she was staggering, slurring her speech, and had a difficult time holding a conversation. Accordingly, the officer testified that he placed Doe on an intoxication hold and had her transported by ambulance to the local hospital because he determined she was unable to care for herself.

The third case plan task required that Doe work with the Department to schedule visitation, attend all visitation, and demonstrate appropriate and healthy boundaries. While the evidence presented at the termination trial was that Doe attended the scheduled visitations, many witnesses

6

testified that Doe did not demonstrate appropriate boundaries and behaviors at these visitations. Hudnall testified that during her time as case manager, Doe demonstrated inappropriate behaviors at visitations: she raised inappropriate subjects with the child; escalated her behaviors during visitations by yelling and getting in people's faces; and on two occasions, Doe was so aggressive towards Department staff that the Department had to have law enforcement present. Hudnall also testified that during one visitation, Doe grabbed the child by the arm and pulled her across the parking lot, stating that she was going to take her just like the Department did. Hudnall explained this ended when the child broke free, ran back to Hudnall, and locked herself in the Department's car. Ultimately, Hudnall testified that although Doe demonstrated good attendance, she never progressed past supervised visits while Hudnall was case manager because the visitations brought up a lot of safety concerns for the child.

Brewer testified that Doe's inappropriate behaviors during visitation continued while she was case manager. Brewer explained that Doe's behavior escalated to a point where police were called to respond during a visitation and that the Department had to cease in-person visitation for a period of time because of Doe's aggressiveness. At one point, in an attempt to make Doe more comfortable, the Department moved visitation to a different facility where Doe had a relationship with the visitation supervisors. However, the visitation supervisors at that facility requested Doe no longer have visitation there because of Doe's inappropriate behavior. Brewer testified that Doe never progressed past supervised visits during the pendency of the case.

The fourth case plan task required Doe to actively work with the Department to participate in all reunification services, including additional referrals for treatment needs, home visits, and any other services necessary to support the reunification process and to show Doe could provide safe and consistent care for her child. While Hudnall testified that while she was case manager, Doe attempted to or completed most of this task; Hudnall also testified that Doe was resistant to services and that her aggressiveness and hostility in communication with the Department made it difficult for Hudnall to do her job to support reunification. Brewer testified that Doe refused to tell the Department where she lived and would not participate in voluntary mental health counseling, despite Brewer's belief that many of the safety concerns for the child were the result of Doe's untreated trauma.

While Doe participated in some additional services in aid of reunification, Doe's participation was sometimes limited, thus reducing the benefits of the additional services. For

example, Dr. Rehil-Crest testified that she conducted a parenting evaluation of Doe during the case. While Doe participated in the evaluation, Dr. Rehil-Crest explained that Doe gave inconsistent answers (including about past drug use) and often provided vague, passive aggressive, or condescending responses that really limited the usefulness of the evaluation. Ultimately, Brewer testified that Doe had not completed this case plan task.

Finally, the fifth case plan task required Doe to demonstrate she understood the special needs of the child and would participate respectfully and collaboratively with the child's providers. Hudnall testified to the Department's efforts to have the child evaluated for autism. When the evaluation was completed and diagnosed the child with autism, Brewer testified that Doe was not receptive to attempts to help her learn how to parent an autistic child. Brewer explained that Doe only accepted feedback about how to parent a child with autism to "shut [Brewer] up," but never consistently implemented the feedback provided. Brewer explained how Doe's resistance to learning about how to parent an autistic child raised concerns for the future, stating:

> My opinion is that [Doe] is not able to manage [the child's] behaviors because they're only going to get worse if we're not--if we're not able to engage with the child appropriately. So meaning, when a parent can't admit that a problem exists, then it is extremely challenging for them to get the buy-in that they--they need counseling, they need to, you know, admit that [the child] has a diagnosis. They're going to butt heads. And as [the child] gets older, she's not afraid to kick her mom or punch out at her, and it's going to end up in a fight.

Brewer concluded Doe had not followed through with this task.

Ultimately, Hudnall, Edwards, and Brewer all testified that Doe had not completed the case plan tasks. Hudnall testified that during her time as case manager, Doe had not progressed to conditions needed for case closure and her behavior during visitations and denial of any self-reflection remained barriers to reunification. Edwards testified that Doe was not interested in following the case plan tasks, but was instead preoccupied with rehashing the past and the circumstance by which the child came into care. Finally, Brewer testified that Doe was extremely resistant to efforts to engage her in the case plan and instead exhibited resistance to the case plan during the duration of the proceedings. Accordingly, substantial and competent evidence supports the magistrate court's finding that Doe neglected the child by failing to complete the case plan.

Although Doe alleges she complied with her case plan tasks, she alternatively argues that it was impossible for her to comply because of the presence of parental alienation during the child protection proceedings. Doe alleges that the evidence presented at trial indicates that parental

8

alienation occurred. As such, Doe argues the magistrate court erred by not finding that this defense was applicable in this case.

In order to find that a parent neglected a child by failing to comply with case plan tasks, the trial court must find that the parent was responsible, either directly or indirectly, for the non-compliance. *Idaho Dep't of Health & Welfare v. Doe*, 161 Idaho 596, 600, 389 P.3d 141, 145 (2016). As such, "impossibility may be asserted as a defense to a claim of neglect founded upon failure to comply with the requirements of a case plan." *Id.*

Here, the magistrate court found that parental alienation was not a defense in this case and, further, that it did not occur in the proceedings:

> The claim of parental alienation is not a defense in this case. Parental alienation did not occur. In addition, the fact that the child "found her voice" during the CPA case and began to vocalize her feelings and opinions with Mother during visits is not parental alienation. This vocalization tracks with progress in therapy toward becoming more able to express in words her feelings and thoughts, both positive and negative. Mother's negative, volatile behavior during most visits was the primary cause of the disconnect.

Substantial and competent evidence supports these findings.

Regardless of what actions or statements the foster parents or other individuals made to the child, Doe was directly responsible for her failure to comply with her case plan tasks. Doe's failure to timely adhere to court orders, maintain sobriety throughout the proceedings, demonstrate appropriate behaviors and boundaries during visitations, actively engage with the Department in reunification efforts, or be respective to feedback about the child's specific needs, was not caused by alleged parental alienation but instead, by Doe's unwillingness to comply with the court-ordered case plan. As a result, alleged parental alienation did not render compliance impossible and, therefore, is not a defense to Doe's failure to complete her case plan tasks.

Moreover, the magistrate court did not err in finding Doe's claims of parental alienation were unsubstantiated. Parental alienation occurs when the acts and conduct of a custodial parent result in the alienation of the love and affection which children naturally have for another parent. *Woods v. Woods*, 163 Idaho 904, 908, 422 P.3d 1110, 1114 (2018). Parental alienation requires a pattern of conduct designed to drive a wedge between the child and the alienated parent. *Id.*

The magistrate court's finding that parental alienation did not occur in this case is supported by substantial and competent evidence. Although some witnesses acknowledged that there had been a change in the child's behavior towards Doe throughout the proceedings, Doe has

9

not established the behavior change was a result of parental alienation. Hudnall testified that when Doe expressed concerns about the foster parents engaging in parental alienation, she took steps to have Doe's concerns addressed. Hudnall explained that she staffed the issue at the Department, talked to the foster parents and asked pointed questions about their communications with the child, and talked to the child's counselor about Doe's concerns. Hudnall testified that she took Doe's concerns seriously but after investigating Doe's claim, Hudnall concluded that parental alienation was not occurring and, even more specifically, that the child was not being told things to alienate her from Doe.

Brewer testified that after Doe raised the issue, she also assessed whether potential parental alienation occurred. Brewer stated that she spoke to the foster parents and "there was nothing, in my assessment and based on my communication with [the child] herself, that--and the communication with both [foster parents], that there was any type of parental alienation going on." If anything, Brewer believed that Doe was making statements to the child that had potential to have negative repercussions on the child's relationship with her foster parents.

In addition, Tyler Sesnon, the child's counselor, testified that he had been incorporating the foster parent(s) into parts of his sessions with the child and had not witnessed the foster parent(s) making statements or actions that would interfere with the child's relationship with Doe during these sessions. Also, Edwards testified that he heard the child make negative comments about Doe and he had concerns about where these comments were coming from; he stated that both he and Brewer brought up this issue with the foster parents. Ultimately, Edwards did not reach a conclusion about whether parental alienation was occurring or if it was occurring, who was causing it.

Further, witnesses testified that to the extent the child's behavior change was her ability to voice her emotions and needs, it was a healthy part of her emotional development. Sesnon testified that he noticed the child make significant progress towards verbalizing her emotions, which was something she would not have entertained when she began counseling. Similarly, Caitlynn Probasco, a community-based rehabilitation service provider, testified the child made progress identifying her emotions and relating these emotions to how she was feeling. As the magistrate court found, the fact the child was expressing her emotions to Doe was not necessarily indicative of parental alienation. Doe's unsubstantiated allegation of parental alienation does not provide a

10

defense to Doe's failure to complete her case plan tasks and, therefore, the magistrate court did not err by finding Doe neglected the child.

### 2. Unable to discharge parental responsibilities

The magistrate court found that Doe was unable to discharge her parental responsibilities, this inability would continue for a prolonged period of time, and this would be injurious to the health, morals, and wellbeing of the child. This finding is supported by substantial and competent evidence.

In light of the evidence presented at the termination trial and detailed above, Doe is unable to discharge her parental responsibilities and there is no evidence that this inability will subside. As the case progressed, Doe failed to take meaningful steps to engage in self-reflection and address the safety concerns presented. Edwards testified that Doe was unable to take productive steps that would have made a difference towards her reunification efforts. Instead, Doe remained fixated on the past and demonstrated such rage during visits that she scared the child, who would hide, cover her ears, or attempt to remove herself from the visit. Despite all the services and supervision provided in the child protection case, Edwards indicated that Doe had not made any improvement in her ability to protect and care for the child.

Brewer similarly testified that Doe was unable to discharge her parental responsibilities to the child and Brewer believed this would continue until Doe is able to recognize that she has untreated mental health concerns. Brewer explained that Doe demonstrated an inability to move past the circumstances surrounding the child's removal, a refusal to self-reflect about the behaviors that brought the child into care, and lacked the capacity to understand how her dysregulation affects the child. Instead, Brewer testified that Doe would engage in conversations and behaviors during visitations that would only escalate the child's negative behavior and Brewer feared how this would manifest when outside of the Department's supervision. Brewer testified that the safety concerns present when the child was first taken into care remained unaddressed. Brewer additionally expressed concerns about Doe's current housing and stated that although Doe would not disclose her housing situation, she believed Doe was homeless. Brewer concluded that Doe's behaviors throughout the case, including during visitation where the child was present, showed an inability to demonstrate social, emotional, and protective capacities necessary to properly parent the child.

Doe's inability to control her emotions manifested during the termination trial. She had several outbursts and talked back to witnesses during their testimony and to the magistrate court when it attempted to defuse the situation. At other times, Doe either left the courtroom or was not present during parts of the proceedings. Taken together, Doe demonstrated unpredictable, intense, and sustained emotional dysregulation and an inability to understand how these behaviors negatively impacted the child and presented safety risks for future reunification. Accordingly, substantial and competent evidence supports the magistrate court's finding that Doe had not made progress in her ability to meet the child's needs during the pendency of the case, and in certain areas, her abilities had deteriorated.

**B.      Best Interests of the Child**

Once a statutory ground for termination has been established, the trial court must next determine whether it is in the best interests of the child to terminate the parent-child relationship. *Tanner v. State, Dep't of Health & Welfare*, 120 Idaho 606, 611, 818 P.2d 310, 315 (1991). When determining whether termination is in the child's best interests, the trial court may consider the parent's history with substance abuse, the stability and permanency of the home, the unemployment of the parent, the financial contribution of the parent to the child's care after the child is placed in protective custody, the improvement of the child while in foster care, the parent's efforts to improve his or her situation, and the parent's continuing problems with the law. *Doe (2015-03) v. Doe*, 159 Idaho 192, 198, 358 P.3d 77, 83 (2015); *Idaho Dep't of Health & Welfare v. Doe*, 156 Idaho 103, 111, 320 P.3d 1262, 1270 (2014). A finding that it is in the best interests of the child to terminate parental rights must still be made upon objective grounds. *Idaho Dep't of Health & Welfare v. Doe*, 152 Idaho 953, 956-57, 277 P.3d 400, 403-04 (Ct. App. 2012). Here, the magistrate court found that termination is in the best interests of the child because the child had improved significantly while in foster care and termination would provide the child with needed stability and permanency. The magistrate court did not err.

Preliminarily, Doe does not challenge the magistrate court's conclusion that termination of Doe's parental rights is in the best interests of the child; consequently, she has waived this issue on appeal. A party waives an issue on appeal if either argument or authority is lacking. *Powell v. Sellers*, 130 Idaho 122, 128, 937 P.2d 434, 440 (Ct. App. 1997). However, even when reviewed on the merits, the magistrate court's decision is supported by substantial and competent evidence.

Edwards testified that the child's emotional regulation and speech had improved while in foster care; specifically that she was utilizing techniques to control her anger management, he thought her speech had improved through speech therapy, and she seemed happier and healthier. Edwards testified that he believed the child appeared well bonded and adjusted to her foster placement during his monthly visits. Further, Edwards testified that while the child had educational accommodations in place through an individualized education program at her school, many of these accommodations had been lifted because of her improvements.

Similarly, Brewer testified that she had seen a significant transformation with the child since she first took over the case; she explained that at the time of the termination trial, the child was taking accountability for her actions, recognizing fault, and maintaining appropriate boundaries with others. Further, Brewer stated that the child had progressed educationally while she was in the Department's care and her teachers praised her growth during a meeting for her individualized education program.

Probasco testified that she works with children to address trauma and teach skills. She explained that she had worked with the child for approximately thirty, one- to two-hour sessions, and saw significant progress in the child's development; the child learned to identify what different emotions feel and look like, relate these emotions to what she experienced during the session, make eye contact, listen, and practice coping skills to deal with anger. Sesnon also testified that the child was making progress towards her goals, including by verbalizing some of her emotions. He explained that the child would not have done so when the sessions first started approximately a year before. Substantial and competent evidence supports the magistrate court's finding that the child had improved after being removed from Doe's care.

Substantial and competent evidence also supports the magistrate court's finding that termination of Doe's parental rights would provide the child with needed stability. During the termination hearing, multiple witnesses testified about their concerns regarding Doe's emotional volatility and its impact on the child. Brewer testified that Doe's untreated mental health and past trauma prevented her from being able to discharge her parental responsibilities; that she refused to acknowledge the child's needs, engaged in combative conversations that escalated both her and the child's inappropriate behavior, and was not able to see how her dysregulation affects the child, despite the child repeatedly demonstrating outward responses to Doe's behavior. Brewer explained that the outstanding safety concerns at the beginning of the case included Doe's physical

13

aggression and the safety and well-being of the child in her care and that these concerns had not been alleviated during the proceedings. Brewer testified that while there were some good visits, Doe often demonstrated escalated and volatile behavior during visits which would cause the child to become dysregulated; the child would try to remove herself from the visitation room, cover her ears, and hide. Brewer explained that the child was always trying to keep her distance from Doe during visits; that visits in the community ended because of Doe's aggressive behavior; that law enforcement had to be called to two visits due to Doe's behavior; and that she was concerned about what would happen between Doe and the child without the Department's supervision.

Similarly, Edwards testified that Doe demonstrated continued instability, the inability to meet the child's basic needs, and the potential to inflict violence on the child in a private setting. Edwards testified that Doe exhibited rage during some visits and, while she never hit anyone, Edwards described Doe's behavior "as being just, you know, a hair away from that. And [the child] was very scared by that behavior." Edwards acknowledged that Doe generally directed this behavior toward the Department but the child witnessed the behavior and was "visibly scared." Edwards concluded that Doe's instability and aggression during visitations showed:

> she is not the kind of person that, even when all the eyes are on her, when it's supervised and monitored, that she isn't able to keep it together. It makes me scared for what might happen to [the child] in a setting where all the eyes aren't on [Doe].

Edwards explained that the child often wanted to stay close to him or the social worker at visits and the child would sometimes hide under the desk or behind the couch to distance herself from Doe and this was markedly different from how the child acted in the foster care setting, where she was bubbly, vivacious, and outgoing. Doe never progressed past supervised visits with the child throughout the lifespan of the case.

Ultimately, both Edwards and Brewer testified they believed termination of Doe's parental rights is in the best interests of the child. Edwards explained that he reached this conclusion because of Doe's instability, inability to meet the child's basic needs, and her potential to inflict violence on the child in a private setting. Brewer similarly testified that termination of Doe's parental rights is in the best interests of the child because it would allow her to have permanency and stability going forward.

Accordingly, substantial and competent evidence supports the magistrate court's findings that the child has improved while being removed from Doe's care and that termination of Doe's parental rights would provide the child with needed stability and permanency. While we

14

acknowledge that Doe loves the child, love does not always translate into the ability to discharge parental responsibilities and Doe's love does not override the magistrate court's finding that terminating Doe's parental rights is in her child's best interests. *Idaho Dep't of Health & Welfare v. Doe*, 149 Idaho 165, 171, 233 P.3d 96, 102 (2010). As such, the magistrate court did not err by finding that termination of Doe's parental rights is in the best interests of the child.

## IV.

## CONCLUSION

The magistrate court's findings that statutory grounds exist to support termination of Doe's parental rights to the child and that termination is in the best interests of the child are supported by substantial and competent evidence. Accordingly, the magistrate court did not err and the judgment terminating Doe's parental rights to the child is affirmed.

Chief Judge LORELLO and Judge GRATTON **CONCUR**.